UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BNSF RAILWAY COMPANY,<br><br>　　Plaintiff, and<br><br>UNION PACIFIC RAILROAD COMPANY,<br><br>　　Plaintiff-Intervenor<br><br>　　　　v.<br><br>TRI-CITY & OLYMPIA RAILROAD COMPANY LLC,<br><br>　　Defendant. | NO. CV-09-5062-EFS<br><br>**ORDER ENTERING COURT'S RULINGS FROM AUGUST 10-11, 2009 HEARING**, **PART II** |

　　A hearing occurred in the above-captioned matter on August 10-11, 2009, in Richland.  Timothy R. Thornton and Leland B. Kerr appeared on Plaintiff BNSF Railway Company's (hereafter "BNSF") behalf; Paul J. Petit and Brandon L. Johnson appeared on Defendant Tri-City & Olympia Railroad Company LLC's (herafter "TCRY") behalf; and Timothy D. Wackerbarth appeared on Plaintiff-Intervenor Union Pacific Railroad's (hereafter

ORDER * 1

"UP") behalf. Before the Court was BNSF's Motion for Preliminary Injunction (Ct. Rec. 3.) This Order serves to supplement the Court's Order Entering Court's Rulings from August 10-11 Part I (Ct. Rec. 46.)

## I. Background

The following findings of fact and conclusions of law are not binding on the Court in future proceedings in this case. Rather, the Court determines for the purposes of a preliminary injunction that these facts probably can be shown. *See*, *e.g.*, *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984).

The origins of this dispute are in the post-World War II era, when the Atomic Energy Commission (hereafter "Commission") decided to allow private companies to use the tracks that serviced the Hanford Site. In 1947, the Commission granted operating rights over trackage beginning near the Kennewick-Richland border and extending beyond Richland through Hanford (hereafter "Richland Trackage") to the Pacific Railroad Company (hereafter "Pacific"), BNSF's predecessor. (Ct. Rec. 5, Ex. A.) In a separate agreement that year, Pacific obtained operating rights over UP's tracks from Kennewick up to the Richland tracks. (Ct. Rec. 5, Ex. B.)

The Interstate Commerce Commission (hereafter "ICC"), predecessor to the Surface Transportation Board (hereafter "STB"), approved these new operations in 1948. (Ct. Rec. 5, Ex. C). The ICC modified Pacific's Agreement with the Commission so that the Commission could not terminate the agreement unless there was a material default that Pacific failed to cure within six (6) months. *Id.*

In 1952, the Commission leased siding and spur tracks near the Richland Trackage to BNSF. (Ct. Rec. 5 Ex. D.) A 1961 Agreement superseded the 1952 lease. The 1961 Agreement not only required six (6)

ORDER * 2

months notice to terminate, (Ct. Rec. 5, Ex. E.), but also recognized the continuing validity of the 1947 Agreement. *Id.* In 1979, the parties amended the 1961 Agreement to remove BNSF's operating rights over some tracks and grant rights over other spur tracks. (Ct. Rec. 5, Ex. F.)

In 1998, the Commission transferred its interest in the Richland Trackage to the Port of Benton (hereafter "Port"). This transfer left the 1947 and 1961 Agreements in place. (Ct. Rec. 5 Ex. O.) Later that year, the Port contracted with TCRY to provide maintenance over the Richland Trackage. In 2002, TCRY and the Port entered into a new agreement under which TCRY provided rail service for the Port and maintained the tracks. (Ct. Rec. 5 Ex. I.) As part of the Port's contract with TCRY, all existing railroad contracts with the Port remained in effect, and TCRY could not modify them in any way. *Id.* at 97-98. This included BNSF's contract with the Port.

In May 2000, BNSF and TCRY contracted to interchange cars going into the Richland Trackage. (Ct. Rec. 5 Ex. H.) They exchanged cars at the Richland Junction and TCRY served BNSF's customers along the Richland trackage for a per-car fee. This contract specifically reserved BNSF's rights under the 1947 and 1961 Agreements. *Id.* at 86.

The City of Richland later asked BNSF to move the place of interchange from the Richland Junction to a site farther east in Kennewick, citing noise complaints from neighbors. While BNSF reviewed this request, it discovered that it could operate its own cars on the Richland Trackage at a savings of around $100-150 per car. BNSF believed it had the right to do this under the 1947 Agreement.

When BNSF informed TCRY of its intention to exercise its rights to operate on the Richland Trackage, TCRY objected vigorously. Its owner,

ORDER * 3

Randolph Peterson, threatened that, beginning July 20, 2009, "track maintenance" would prevent BNSF from using the Richland Trackage at all. Since that time, BNSF has physically been blocked from using the tracks, although TCRY has allowed UP to use it during this period.

BNSF filed this suit on July 20, 2009. (Ct. Rec. 1.) UP moved to intervene on August 4, 2009 (Ct. Rec. 26), and the Court granted UP's Motion. (Ct. Rec. 46.)

## II. Discussion

**A.   Jurisdiction**

TCRY asserts that the Court must dismiss this case because the STB has exclusive jurisdiction over this case because it involves railroad operations. Alternatively, TCRY argues that STB has primary jurisdiction over this case, so the Court should stay this action pending STB resolution in order to take advantage of agency expertise.

**1.   Exclusive Jurisdiction**

Under 49 U.S.C. § 10501(b), the STB has exclusive jurisdiction over rail carrier transportation and the expansion or contraction of carriers' rights to operate on tracks.  TCRY argues that an order recognizing BNSF's rights to the Richland Trackage would amount to an expansion of BNSF's rights, something that only the STB may do.  Additionally, says TCRY, the Court would necessarily have to interpret the ICC's 1948 Order granting the parties' rights over the Richland Trackage in order to resolve this case, and section 10501(b) precludes the Court from interpreting ICC orders.

TCRY's arguments are unpersuasive.  This dispute is over breach of the 1947 and 1961 Agreements.  The STB does not adjudicate contract disputes. *See PCS Phosphate Co., Inc. v. Norfolk S. Corp*, 559 F.3d 212

ORDER * 4

(9th Cir. 2009). A favorable judgment for BNSF does not expand or alter operating rights. It merely recognizes and enforces BNSF's rights under the 1947 Agreement, which STB approved in its 1948 Order.

The cases TCRY cites for the proposition that STB jurisdiction is exclusive are not pertinent because they do not address § 10501(b), which is the statute TCRY states applies to this case; instead, they deal with railroad mergers and labor disputes. *See United Transp. Union v. Burlington N. Santa Fe R.R. Co.*, 528 F.3d 674 (9th Cir. 2008); *Ry. Labor Executives' Assoc. v. S. Pac. Transp. Co.*, 7 F.3d 902 (9th Cir. 1993); *AT & T Comm., Inc. v. Consol. Rail Corp.*, 285 F. Supp. 2d 649 (E.D. Pa. 2003). These cases are irrelevant to this Court's jurisdiction over claims that might encroach on the STB's exclusive jurisdiction under § 10501(b), and this case does not involve a merger or labor dispute.

Furthermore, TCRY's contention that this Court may not enforce the 1948 ICC Order is incorrect. Federal courts have jurisdiction to enforce STB orders. *See* 28 U.S.C. § 1336(a); *Walters v. Roadway Express, Inc.*, 557 F.2d 521 (5th Cir. 1977). Therefore, this Court may enforce the 1948 ICC Order that approved the 1947 Agreement.

**2.   Primary Jurisdiction**

"The doctrine of primary jurisdiction 'is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts.'" *Davel Comm., Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086 (9th Cir. 2006) (quoting *Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002). It is a discretionary doctrine that allows courts to stay proceedings while an administrative agency considers them. *See Chabner v. United of*

ORDER * 5

*Omaha Life Ins. Co.*, 225 F.3d 1042, 1051 (9th Cir. 2000). There are two (2) tests in the Ninth Circuit to determine if a case is in an agency's primary jurisdiction. Under the first, "the doctrine applies where there is '1) the need to resolve an issue that 2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority 3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that 4) requires expertise or uniformity in administration.'" *Davel*, 460 F.3d at 1086-87 (quoting *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987). Under the second, the court must consider "1) whether application will enhance court decision-making and efficiency by allowing the court to take advantage of administrative expertise; and 2) whether application will help to assure uniform application of regulatory laws." *Chabner*, 225 F.3d at 1051.

As stated above, for all its intricacy, this dispute is about a contract. Contract interpretation is not in STB's jurisdiction and does not require STB expertise, and indeed the STB refrains from arbitrating contract disputes. The Court declines to find that this case is in the STB's primary jurisdiction under either test because resolving the dispute requires only determining the parties' rights under contract, not altering rights over railroad tracks. Nevertheless, because the Court is imposing a complicated operating agreement on the parties pending this case's resolution, the Court retains the authority to delegate further disputes to the STB if technical railroad issues arise whose resolution would benefit from STB expertise.

**B.   Preliminary Injunction**

Because the Court has determined it has jurisdiction over this case, it remains to be considered whether the preliminary injunction should be issued.

**1.   Standard**

"A preliminary injunction is not a preliminary adjudication on the merits: it is an equitable device for preserving the status quo[1] and preventing the irreparable loss of rights before judgment." *Textile Unlimited v. A..bmhand Co.*, 240 F.3d 781, 786 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009). Where, as here, a plaintiff seeks to alter the status quo by commanding a positive act, i.e., mandatory preliminary relief, a heightened standard applies and an injunction should not be issued unless the facts and law *clearly* favor the moving party. *See Dahl v. HEM Pharms. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (emphasis added).[2]

---

[1] "Status quo" means the last uncontested status that preceded the pending controversy. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000). Given that BNSF's operating rights on the Richland Trackage are in dispute, the last "uncontested status" was TCRY conducting interchange services for BNSF.

[2] TCRY incorrectly asserts that the Ninth Circuit's heightened preliminary injunction standard requires a "heavy and compelling

ORDER * 7

**2. Analysis**

    **a.  Likelihood of Success on the Merits**

The Court concludes that BNSF is likely to succeed on the merits of its claim that TCRY breached the 1947 and 1961 Agreements and subsequent addenda. In the event of a material breach by BNSF's predecessor, the 1947 agreement required that TCRY's predecessor give six (6) months notice and an opportunity to cure before terminating the agreement. (Ct. Rec. 5, Ex. B at 21.) The 1961 Agreement also required six (6) months written notice before termination. (Ct. Rec. 5, Ex. E at 54.)

TCRY breached the Agreements by blocking the transfer stations and preventing BNSF from accessing the Richland Trackage. There is no evidence that BNSF breached the Agreements in any way, much less materially, or that TCRY provided six (6) months' notice before terminating the Agreements. Further, TCRY itself has no authority to terminate the Agreements without the Port's approval. TCRY's lease with the Port states that TCRY may not terminate operating contracts that existed at the time of the lease. (Ct. Rec. 5, Ex. I at 97–98.)

Although TCRY argues that the Agreements allowed BNSF to use only the interchange facilities and not to operate on the tracks, the record clearly contradicts this argument. The 1947 Agreement clearly states that BNSF's predecessor was granted the "right to operate with its

---

showing," as opposed to a clear showing. However, the Ninth Circuit case TCRY relies on - *Kikumura v. Hurley*, 242 F.3d 950 (9th Cir. 2001) - is actually a Tenth Circuit case. Several district courts have also mistakenly cited *Kikumura* as Ninth Circuit authority. *See, e.g., McDougald v. Kennett*, 2008 WL 4378073 at *13 (D. Nev., Aug. 12, 2008).

ORDER * 8

employes [sic] and equipment over the existing track," not just access to the interchange facility. (Ct. Rec. 5, Ex. A at 9.)

Likewise, TCRY's assertion that the subsequent addenda to the original agreements and the 2002 lease between the Port and TCRY somehow abrogated BNSF's rights is also unpersuasive. As stated above, TCRY's lease with the Port explicitly left intact the Port's existing contracts with other railroad carriers. (Ct. Rec. 5, Ex. I at 97-98). The 1979 Amendment did not terminate BNSF's contractual rights either, because it allowed BNSF to use certain spur and siding tracks in North Richland. (Ct. Rec. 5, Ex. F at 61.)

Therefore, BNSF has shown a high probability of success on the merits at this stage.

### b. Likelihood of Irreparable Harm

BNSF has shown that it is likely to suffer irreparable harm if the injunction does not issue. If BNSF is unable to continue its rail service for customers along the disputed tracks, it is likely to lose these customers forever. The e-mail sent by one (1) disgruntled customer berating BNSF for the service interruption and rate change is an indication of likely things to come. (Ct. Rec. 5, Ex. L at 147.) Additionally, if BNSF is excluded from the Richland Trackage, many of BNSF's customers would be driven to UP because UP would be the only carrier along these tracks. If this happens, no monetary recovery at the end of this suit could compensate for loss of goodwill. *Cf. Gateway E. Ry. Co. v. Terminal R.R. Assoc. of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (holding that movant railroad company showed irreparable harm by loss of goodwill); *see also CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005) (holding that customer losses resulting from

ORDER * 9

exclusion from tracks would cause damages so speculative as to be impossible to calculate).

### c.  Balance of Equities

The purpose of balancing the equities is to compare the harm to the moving party if the injunction is not issued to the harm to the non-moving party if the injunction is issued wrongfully. *See Stormans, Inc. v. Selecky*, 571 F.3d 960, 987-88 (9th Cir. 2009) (citing *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980)).

The equities tip sharply in BNSF's favor.  If BNSF is denied access to the tracks, it could lose significant business from its shipper clients.  These clients may decide to use UP instead, because UP would be the only carrier along the disputed tracks.  If this happened and BNSF ultimately won this case, those customers would not be likely to return to BNSF, and this loss of business opportunity and goodwill would not be compensable.

In contrast, any harm to TCRY from a wrongfully-issued injunction would be measurable.  TCRY would recover its per-car switching fee multiplied by the number of cars BNSF operates on the Richland Trackage pending resolution of this case.  Additionally, BNSF will have to return as a customer to TCRY if it loses this case in order for BNSF to serve its customers along these tracks.  Therefore, the potential harm to BNSF is far greater than to TCRY.

### d.  Public Interest

Finally, the Court finds that it is in the public interest to encourage competition among the railroads and to ensure that railroad

service remains efficient.  Therefore, all the requirements for a preliminary injunction have been met.

### III. Conclusion

For the foregoing reasons, the Court grants BNSF's Motion for Preliminary Injunction.  The terms of the Injunction shall be those agreed to by the parties in the Proposed Operating Plan the parties filed on August 14, 2009 (Ct. Rec. 52, Ex. A at 4-5.)

Accordingly, **IT IS HEREBY ORDERED**: BNSF's Motion for Preliminary Injunction **(Ct. Rec. 3)** is **GRANTED**.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and distribute copies to counsel.

**DATED** this ___28th___ day of September 2009.


                    s/Edward F. Shea
                    
                    EDWARD F. SHEA
            United States District Judge


Q:\Civil\2009\5062.PI2.wpd

ORDER * 11