UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

BNSF RAILWAY COMPANY,

    Plaintiff,

UNION PACIFIC RAILROAD
COMPANY, and PORT OF BENTON,

    Plaintiff-Intervenors,

        v.

TRI-CITY & OLYMPIA RAILROAD
COMPANY LLC,

    Defendant.

NO. CV-09-5062-EFS

**ORDER ENTERING COURT'S RULINGS
FROM FEBRUARY 23, 2011 HEARING**

A hearing occurred in the above-captioned matter on February 23, 2011, in Richland.  Timothy R. Thornton and Leland B. Kerr appeared on Plaintiff BNSF Railway Company's (BNSF) behalf; Nicholas D. Kovarik, Paul J. Petit, Robert A. Dunn, and David L. Meyer[1] appeared on Defendant Tri-City & Olympia Railroad Company LLC's (TCRY) behalf; Timothy D. Wackerbarth appeared on Plaintiff-Intervenor Union Pacific Railroad's (UP) behalf; Rob J. Crichton and Thomas A. Cowan, Jr. appeared on Plaintiff-Intervenor Port of Benton's ("Port") behalf.  Before the Court were TCRY's Motion for Remand, ECF No. 200, Objection and Motion to Strike Portions of Declaration of Scott Keller, ECF No. 167, and Motion

---

[1]  Mr. Meyer appeared telephonically.

ORDER * 1

for Summary Judgment Against the Port of Benton, ECF No. 142; and the

Port's Motion to Strike Supplemental Peterson Declaration, ECF No. 225,

and Motion for Partial Summary Judgment, ECF No. 171.   This Order

memorializes and supplements the Court's oral rulings.[2]

**BACKGROUND[3]**

**I.   TCRY's Motion to Strike Keller Declaration**

TCRY moves to strike Paragraphs 6 and 8 of Scott Keller's

Declaration because it includes assertions that are not based on personal

knowledge.   TCRY objects to the underlined language in Paragraph 6:

> At the time of the lease negotiations, TCRY's President,
> Randolph V. Peterson, was fully familiar with BNSF's use of the
> Richland Trackage.   The Port made it clear to TCRY, and Mr.
> Peterson fully understood, the Port's intent that BNSF would
> continue to have access to the trackage after TCRY and the Port
> entered into the Lease.

---

[2]   At the hearing, the Court indicated it would circulate a written

order entering its oral rulings to the parties and provide an opportunity

for comment.   After extensive consideration, the Court finds this

unnecessary and issues this Order without comment from the parties.

[3]   When considering this motion and creating this factual section,

the Court did not weigh the evidence or assess credibility; instead, the

Court believed the undisputed facts and the opposing party's evidence and

drew all justifiable inferences therefrom in its favor.   *See Anderson v.

Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).   However, the Court did

not accept as true assertions made by the opposing party if they were

flatly contradicted by the record.   *See Scott v. Harris*, 550 U.S. 372,

380 (2007).   Disputed facts are supported by a citation to the record,

while undisputed facts are not.

ORDER * 2

It also objects to the underlined language in Paragraph 8:

> Mr. Peterson sought the removal of the foregoing provisions in what was then § 7.3 of the draft Lease. Attached hereto as Exhibit 2 is a true and correct copy of a marked-up copy of the draft lease that the Port received from TCRY during negotiations. My understanding is Mr. Peterson was responsible for the handwritten provisions, including the striking of that provision. The Port refused to accede to TCRY's request in order to make clear that TCRY did not have exclusive right to access the tracks.

TCRY takes issue with Mr. Keller's statements as to: 1) what the Port "made clear" to Mr. Peterson, 2) what Mr. Peterson "fully understood," and 3) whether Mr. Peterson "sought the removal" of certain language in what was then Paragraph 7.3 in the draft Railroad Lease.

Mr. Keller was the Port's Executive Director at the time of the negotiations and executed the Railroad Lease on the Port's behalf. He was "fully familiar" with the negotiations. He had received the correspondence that circulated among the parties in 2001, which clarified BNSF's position regarding the parties' respective rights to the Richland Trackage.

Those facts are sufficient for the Court to reasonably infer that Mr. Keller had personal knowledge of the lease negotiations, including what the Port "made clear" to TCRY. Fed. R. Civ. P. 56(e) (requiring an affiant to be competent to testify as to the matters stated and base his affidavit on his personal knowledge). And because Mr. Keller bases his conclusion that Mr. Peterson "sought the removal" of specific language in Paragraph 7.4 on the Port's receipt of a marked-up copy of the draft Lease (which reflects that "Draft Changes" were "made by RV Peterson"), Mr. Keller had sufficient personal knowledge to conclude that Mr. Peterson sought to remove that language. Indeed, Mr. Peterson's declaration substantiates that conclusion. ECF No. 187-2, at 1. Yet,

ORDER * 3

his statement regarding what Mr. Peterson "fully understood" is speculative as to Mr. Peterson's state of mind and cannot be used to infer TCRY's intent behind agreeing to Paragraph 7.4's language. Accordingly, the Court denies (as to what the Port "made clear" to Mr. Peterson and whether Mr. Peterson "sought the removal" of certain language in what was then Paragraph 7.3 in the draft Railroad Lease), and grants (as to what Mr. Peterson "fully understood") in part TCRY's motion to strike.

**II.  The Port's Motion to Strike Supplemental Peterson Declaration**

The Port moves to strike the Supplemental Declaration of Randolph V. Peterson and the eight attached documents because they 1) are not based on "newly-discovered" evidence; and 2) go beyond what the Court contemplated and authorized in allowing TCRY to file a sur-reply.

Although generally loathe to consider late filings, the Court found good cause to allow TCRY to file a sur-reply based on the September 12, 2000 letter.  These filings include pre-2001 communications between the Port, TCRY, and UP, which aid the Court in understanding whether the parties envisioned the railroads to have direct access to the Richland Trackage or to interchange with TCRY.

The Court finds that Mr. Peterson's Supplemental Declaration and the accompanying sur-reply memo were not an improper effort to change TCRY's version of the facts.  Although the letters were in TCRY's files for more than a decade, and although TCRY has been involved in this case for more than eighteen months, there is no evidence in the record to suggest that TCRY knew of those documents until after the deadline had passed for filing its opposition to the Port's summary judgment.  *Cf. Goodstein v. Continental Cas. Co.*, 509 F.3d 1042, 1051 (9th Cir. 2007) (finding that

documents which could have been brought to the district court's attention at the time of summary judgment were not "newly discovered evidence" merely because they were presented with a motion for reconsideration). Indeed, the letters attached as exhibits were purportedly found "as a result of a search of all TCRY business records," a search for any representations the Port may have made to TCRY before signing the Railroad Lease. ECF No. 224, ¶ 6. The Port has not submitted evidence proving that these documents were not "newly discovered." Given the record, the Court has no reason to refuse to consider TCRY's sur-reply and the accompanying Supplemental Declaration. Accordingly, the Port's motion to strike is denied.

**III. Factual Background**

**A.   1947 Agreement**

On November 6, 1947, the United States, by and through the U.S. Atomic Energy Commission ("Commission"), entered into an agreement ("1947 Agreement") with several railroads to establish service to the Hanford site. BNSF and UP, the undisputed successors-in-interest to the 1947 Agreement, were granted "equal joint" operating rights over trackage beginning near Kennewick and extending beyond Richland ("Richland Trackage").

Article 18 of the 1947 Agreement provides:

> Except as provided in this contract, all disputes concerning questions of fact which may arise hereunder, and which are not disposed of by mutual agreement, shall be decided by a representative of the Commission duly authorized to supervise and administer performance of the work hereunder, who shall reduce his decision to writing and mail a copy thereof to the Railroads. Within thirty (30) days for this mailing, the Railroads may appeal in writing to the Commission, whose written decision thereon shall be final and conclusive. Pending decision of a dispute hereunder, the Railroads shall diligently proceed with performance under this contract. To the extent

that disputes involve questions which are subject to determination by the Interstate Commerce Commission, National Railroad Adjustment Board, or other regulatory body having jurisdiction of such questions, this Article shall not apply; nor shall this Article apply to disputes between the Railroads which do not involve the Commission.

Article 8 also provides:

The Commission will have the general control, management and administration of said railway between points B and E, said interchange facilities and wye, and will at all times keep the same in good condition and repair . . . .

**B.    1961 Agreement and 1988 Indenture**

In 1961, the Commission entered into second agreement ("1961 Agreement") with the Railroads.  The 1961 Agreement did not modify, delete, or otherwise alter Article 18 of the 1947 Agreement.  In 1998, the United States, by and through the U.S. Department of Energy ("DOE"), conveyed ownership of the Richland Trackage to the Port through an Indenture, thereby assigning the DOE and Commission's rights under the 1947 and 1961 Agreements to the Port.  As a result of these agreements, the Port has the right to terminate BNSF and UP's rights to use the Richland Trackage upon six months notice.

**C.    Railroad Lease**

On October 1, 1998, the Port entered into a Maintenance and Operation Agreement with TCRY's predecessor, Livingston Rebuild Center, Inc. ("Livingston"), under which it agreed to pay Livingston $325,000 per year for the maintenance of the Richland Trackage.  ECF No. 197, Ex. D.  These contractual rights and obligations were subsequently assigned to TCRY.  *Id*. Ex. G.

In May 2000, BNSF and TCRY contracted to interchange cars going into the Richland Trackage ("Interchange Agreement").  *Id*. Ex. H.  They exchanged cars at the Richland Junction and TCRY served BNSF's customers

1  along the Richland Trackage. *Id*. TCRY maintained the trackage at its own
2  expense; BNSF could use the tracks without charge. This contract
3  specifically reserved BNSF's rights under the 1947 and 1961 Agreements.
4  *Id*. TCRY began charging a per-car fee for its services.

5  In a September 12, 2000 letter to then-TCRY President John
6  Haakenson, the Port's Assistant Executive Director Scott Keller
7  acknowledged that the Port was paying TCRY to maintain the railroad under
8  a contract that allowed TCRY to charge a fee for its railroad operations,
9  the revenue from which would offset the cost of maintenance. ECF No.
10 224, Ex. 1. Recognizing that UP was using the Richland Trackage without
11 paying a fee, the Port directed TCRY "to give written notice to [UP]
12 terminating its rights to use the Port of Benton track." *Id*. Beginning
13 November 14, 2000, UP could no longer continue its unauthorized use of
14 the Richland Trackage: it would need to establish an interchange
15 agreement with TCRY. *Id*. Exs. 5 & 6.

16 From approximately April 2001 through November 2001, TCRY and BNSF
17 continuously disagreed about BNSF's right to operate on the Richland
18 Trackage. ECF No. 197, Ex. K. BNSF claimed the 1947 and 1961 Agreements
19 allowed it to directly operate on the Richland Trackage without
20 interchanging; TCRY maintained that BNSF could only operate on the
21 Richland Trackage if it operated under the Interchange Agreement. *Id*.
22 This correspondence was circulated to the Port.

23 In 2002, TCRY and the Port began negotiating a lease agreement
24 ("Railroad Lease"), which would authorize TCRY to provide rail and track
25 maintenance services on the Richland Trackage. Mr. Keller negotiated on
26 the Port's behalf; TCRY CEO Randolph V. Peterson negotiated on behalf of
TCRY. At this time, BNSF had been operating under the May 8, 2000

ORDER * 7

Interchange Agreement.   On June 24, 2002, Mr. Peterson proposed the following language be removed from Paragraph 7.3:

> 7.3  ~~The Tenant shall not take any actions which will amend, modify, terminate or invalidate any existing contracts which the Port has with any other railroad carrier, without the Port's prior written consent.~~  The Tenant shall continue to provide rail access to areas currently served by the railroad unless the Port and Tenant mutually agree that such access is no longer practicable.  ~~All tariffs adopted by the Tenant for the use of the Railroad shall be approved by the Port.~~

ECF No. 197, Ex. N.   Paragraph 7.3 became Paragraph 7.4 in the final draft, which reads as follows:

> 7.4   The Tenant shall not take any actions which will amend, modify, terminate or invalidate any existing contracts which the Port has with any other railroad carrier, without the Port's prior written consent.   The Tenant shall continue to provide rail access to areas currently served by the railroad unless the Port and Tenant mutually agree that such access is no longer practicable.

ECF No. 174, Ex. M.

The parties disagree as to Paragraph 7.4's meaning.   Mr. Keller maintains that, in retaining this language, the Port intended to make clear that TCRY could not interfere with the Port's pre-existing contractual relationships: UP and BNSF would continue to have "equal joint" operating rights under the 1947 and 1961 Agreements after TCRY and the Port entered into the Railroad Lease.   ECF No. 162, ¶ 6 & 7.

But Mr. Peterson maintains that this language has nothing to do with exclusive access to the Richland Trackage: it relates to TCRY's right to "amend, modify, terminate or invalidate" contracts between the Port and other railroads.   Although TCRY and BNSF were aware of each other's positions on this issue, TCRY claims it did not know the Port's position. ECF No. 197, ¶ 34.

ORDER * 8

Railroad Lease Paragraph 23.8 entitles TCRY to the right of quiet possession:

> QUIET POSSESSION.  The Port agrees that upon compliance with the terms and conditions of this Lease, the Tenant shall at all times have the right to the quiet use and enjoyment of the Property for the term of the Lease and any extension.

The parties disagree as to whether this provision grants TCRY an unqualified right to quiet enjoyment, which, by implication, would allow TCRY to require UP and BNSF to interchange with TCRY.  TCRY claims it would not have executed the Railroad Lease if Paragraph 7.4 limited this right to require others to interchange with TCRY, claiming such an agreement makes no economic sense because UP and BNSF's direct operation would increase its maintenance burden without compensation.  *Id.* ¶ 37–39. According to TCRY, if BNSF and UP were allowed to operate "direct" on the Port's Railroad, TCRY would be deprived of all interchange revenue – but its other sources of revenue and the Port payment would continue.

### D.  Legal Action

In 2009, BNSF informed TCRY it intended to exercise its rights to directly operate on the Richland Trackage.  TCRY objected: Mr. Peterson threatened that, beginning July 20, 2009, "track maintenance" would prevent BNSF from using the Richland Trackage at all.  And on July 20 and 21, 2009, TCRY erected a barrier which physically prevented a BNSF locomotive from reaching BNSF customers along the Richland Trackage.  A few days later, TCRY requested that the Port terminate the Richland Trackage agreements with BNSF.  The Port refused.

BNSF filed this suit on July 20, 2009.  ECF No. 1.  UP moved to intervene on August 4, 2009, ECF No. 26, and the Court granted UP's Motion.  ECF No. 46.  On August 12, 2009, the Court granted BNSF's motion

for a preliminary injunction, prohibiting TCRY from blocking BNSF's access to the Richland Trackage and requiring TCRY to charge its customary fee. ECF No. 46 & 93. TCRY filed an interlocutory appeal on September 9, 2009, which was voluntarily dismissed.

### E.    The Port's Intervention

The Court granted the Port's request to intervene on March 8, 2010. ECF No. 121. On June 2, 2010, TCRY filed a separate but related action in Benton County Superior Court against the Port, asserting claims for inverse condemnation, breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, and quantum meruit. ECF No. 209, Ex. 1. By order dated August 20, 2010, the Superior Court stayed the state court action, pending resolution of the federal claims in this Court. *Id*. Ex. 2.

On September 29, 2010, the Port amended its complaint, asserting that TCRY breached Railroad Lease Paragraph 7.4, which prohibits TCRY from "amend[ing], modify[ing], terminat[ing], or invalidat[ing]" other railroads' existing contractual relationships with the Port, when it temporarily blocked BNSF Railroad Company (BNSF)'s access to the Richland Trackage in July 2009. ECF No. 136. TCRY asserted several counterclaims against the Port: inverse condemnation, breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, quantum meruit, and tortious interference with contract. ECF No. 165, at ¶¶ 18-24.

### F.    Recent Developments

TCRY filed the instant motion for summary judgment on October 20, 2010, seeking dismissal of the Port's Amended Complaint. And on November 24, 2010, the Port moved for summary dismissal of TCRY's counterclaims,

ORDER * 10

each of which relies on TCRY's theory that the right to quiet enjoyment under the Railroad Lease allows it to gain revenue by requiring railroads to interchange with it. ECF No. 171. On December 1, 2010, TCRY sought to continue hearing on the instant motions for summary judgment in order to obtain discovery regarding the intent of the contracting parties when drafting Railroad Lease Paragraph 7.4. ECF No. 175. The Court denied the motion.

TCRY then moved on December 17, 2010, to remand the inverse condemnation claims to state court for determination where they were originally asserted. ECF No. 200.

On January 3, 2011, TCRY moved to reconsider the Court's continuance denial, or in the alternative, to file a sur-reply. ECF No. 210. The basis for that motion was a September 12, 2000 letter from Mr. Keller to John Haakenson of TCRY, which TCRY counsel represented had been located on December 31, 2010, by Mr. Peterson, though this case had then been pending for some seventeen months. ECF No. 224, ¶ 4. The Court granted TCRY leave to file a sur-reply, ruling that "[g]iven newly discovered evidence which may bear on interpretation of the Lease, the Court finds good cause to allow TCRY to file a sur-reply to the Port of Benton's ("Port") Motion for Summary Judgment." ECF No. 218.

## DISCUSSION

**I.  Motions for Summary Judgment**

TCRY moves for summary judgment dismissal of the Port's Amended Complaint, arguing that both claims fail as a matter of law: neither the Railroad Lease nor any of the Richland Trackage agreements give the Port the authority to resolve disputes between railroads and TCRY did not breach the Railroad Lease. The Port also moves for summary judgment,

ORDER * 11

asking the Court to dismiss TCRY's counterclaims, which all center on TCRY's right to quiet enjoyment of the leased property.

**A.    Summary Judgment Standard**

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party opposing summary judgment must point to specific facts establishing a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion.  *Celotex Corp.*, 477 U.S. at 322.

**B.    Applicable Law**

When interpreting a contract, the Court's role "is to ascertain the parties' intentions and give effect to their intentions." *Taylor-Edwards Warehouse & Transfer Co. of Spokane, Inc. v. Burlington N., Inc.*, 715 F.2d 1330, 1334 (9th Cir. 1983) (citing *Jones v. Hollingsworth*, 88 Wn.2d 322, 326 (1977)).  Under Washington law, "extrinsic evidence is admissible as to the entire circumstances under which the contract was made, as an aid in ascertaining the parties' intent." *Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990).  The Court considers:

> (1) the subject matter and objective of the contract, (2) the circumstances surrounding the making of the contract, (3) the subsequent conduct of the parties to the contract, (4) the reasonableness of the parties' respective interpretations, (5) statements made by the parties in preliminary negotiations, (6) usages of trade, and (7) the course of dealing between the parties.

*Spectrum Glass Co, Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 129 Wn. App. 303, 311 (2005) (citing *Berg*, 115 Wn.2d at 666-68). "Such evidence is admissible regardless of whether the contract language is deemed ambiguous." *Id*. Yet, neither a unilateral or subjective opinion as to the meaning of a contract word or term nor evidence that would contradict or vary the written word is admissible extrinsic evidence. *Hollis v. Garwall*, Inc., 137 Wn.2d 683, 695 (1999).

If there are two or more reasonable meanings to contract language, a question of fact is presented that precludes summary judgment. *Anderson Hay & Grain Co., Inc v. United Dominion Indus., Inc.*, 119 Wn. App. 249, 255 (2003). Only when interpretation does not depend on extrinsic evidence, or when extrinsic evidence leads to only one reasonable interpretation, can intent be decided as a matter of law on summary judgment. *Id*.

**C. TCRY's Motion for Summary Judgment Against the Port of Benton**

TCRY moves for summary judgment, asking the Court to dismiss both claims in the Port's Amended Complaint because neither the Railroad Lease nor any of the Trackage Agreements give the Port the authority to resolve disputes and TCRY did not as a matter of law breach the Railroad Lease. Both BNSF and the Port oppose the motion, arguing that material issues of fact preclude summary judgment.

1.   <u>The Port's Authority to Resolve Disputes</u>

TCRY seeks summary dismissal of the Port's first cause of action, arguing that the Port does not have the sole authority to decide issues under the Trackage Agreements. In response, the Port clarifies its claim: it seeks the Court's assistance in establishing a protocol for resolving disputes under the operating agreements. ECF No. 136-1, at 11.

ORDER * 13

a)   *1947 Agreement*

Article 18 of the 1947 Agreement provides:

Except as provided in this contract, all disputes concerning questions of fact which may arise hereunder, and which are not disposed of by mutual agreement, shall be decided by a representative of the Commission duly authorized to supervise and administer performance of the work hereunder, who shall reduce his decision to writing and mail a copy thereof to the Railroads.  Within thirty (30) days for this mailing, the Railroads may appeal in writing to the Commission, whose written decision thereon shall be final and conclusive. Pending decision of a dispute hereunder, the Railroads shall diligently proceed with performance under this contract.  To the extent that disputes involve questions which are subject to determination by the Interstate Commerce Commission, National Railroad Adjustment Board, or other regulatory body having jurisdiction of such questions, this Article shall not apply; nor shall this Article apply to disputes between the Railroads which do not involve the Commission.

Article 18 of the 1947 Agreement was never modified by any subsequent agreements between the Railroads.  Its plain language unambiguously provides that the Port, as successor-in-interest to the Commission, has the authority to decide "disputes concerning questions of fact."  The parties agree that no factual disputes have been presented to the Port and thus, the 1947 Agreement does not confer dispute-resolution authority upon the Port in this instance.

b)   *Railroad Lease*

Paragraph 7.2 of the Railroad Lease states:

7.2  In the event the Department of Energy or any other user of the railroad files a complaint with the Port concerning the Tenant's rates, tariffs or operations, the Port will notify the Tenant of the complaint and will attempt to resolve the complaint through negotiations with the tenant and the complainant.
7.2.1    If the complaint involves matters which are within the purview of the National Surface Transportation Board (NSTB), the Port will, to the extent applicable, utilize the rules of the NSTB to resolve the dispute.

ORDER * 14

> 7.2.2    If the Port is unable to resolve the complaint which is within the jurisdiction of the NSTB and which the NSTB will accept for resolution, the complaint shall be referred to the NSTB, if permitted by the terms and conditions of the Indenture and the Quit Claim Deed.
> 7.2.3    Complaints which can not be referred to the NSTB, shall be resolved pursuant to the terms and conditions of this Lease.

The Railroad Lease unambiguously grants the Port authority to resolve "complaints" "filed" with the Port "concerning the Tenant's rates, tariffs, or operations." Because the parties agree that no such complaint was filed in connection with this lawsuit, the Port's authority under the Lease to decide BNSF's rights to operate on the Richland Trackage has not been invoked.

> c)    *General Control, Management, and Administration*

Article 8 of the 1947 Agreement provides:

> The Commission will have the general control, management and administration of said railway between points B and E, said interchange facilities and wye, and will at all times keep the same in good condition and repair . . . .

The Port's First Amended Complaint seeks a declaratory judgment "that the Port retains the general control, management and administration of the Richland Trackage, interchange facilities, and wye." ECF No. 136-1, at 13.

TCRY argues that there is no immediate and real controversy which would warrant such a declaratory judgment. *See* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."); *see also Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994)("[A] district court must first inquire whether there is an actual case or controversy within

ORDER * 15

its jurisdiction.").   In determining whether such case or controversy exists, courts ask whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

This dispute is over the alleged breach of the 1947 and 1961 Agreements and the Railroad Lease.  TCRY does not dispute that the Port received certain rights by assignment.   Yet, the Port also seeks a declaratory judgment setting "procedures for resolving disputes regarding operating rights that exist under the Richland Trackage Contracts and the Lease and to prevent further actions which would violate the Court's determination."   Nowhere does it seek sole authority over dispute resolution on the Richland Trackage.   On this record, the Court rules there is no basis to dismiss and accordingly, denies TCRY's motion to do so.

> 2.   <u>Breach of the Railroad Lease</u>

It is First Amended Complaint, the Port contends that TCRY breached Paragraph 7.4 by "interfering with BNSF's existing contractual rights under the Richland Trackage Contracts," when it blocked BNSF's access to the Richland Trackage in July 2009.   ECF No. 136-1.   It seeks a declaratory judgment and permanent injunction preventing TCRY from further breaching Paragraph 7.4 by interfering with other railroads' operating rights.

TCRY seeks dismissal on summary judgment, arguing that it did not breach Paragraph 7.4 because that paragraph does not explicitly prohibit TCRY from "interfering with" BNSF's contract rights with the Port.   In response, the Port contends that Paragraph 7.4 was intended to make clear

ORDER * 16

1  that TCRY's operations on the Richland Trackage were subject to the

2  concurrent rights of other railroads operating on it and that TCRY was

3  in breach by interfering with those rights.

4      Because only TCRY has moved for summary judgment on this issue, the

5  Court views the entire circumstances under which the Railroad Lease was

6  made in a light most favorable to the Port.  The Court concludes that the

7  Port has presented a reasonable interpretation of Railroad Lease

8  Paragraph 7.4 that at the least precludes summary judgment.  The 1947 and

9  1961 Agreements granted BNSF and UP the right to operate on the Richland

10  Trackage without further payments.  The Port could terminate BNSF and

11  UP's right to operate upon six months notice.[4]  These rights were not

12  modified by any subsequent agreements.[5]  When TCRY entered into the

13  Railroad Lease, it took the Port's rights and it took them subject to the

---

[4]  The Court has already preliminarily found that "TCRY's lease with
the Port explicitly left intact the Port's existing contracts with other
railroad carriers," and that BNSF had a right to operate on the tracks.
ECF No. 93, at 8-9.

[5]  Other agreements indicate that the parties understood that BNSF
and TCRY retained the right to direct access to the Trackage.  The May
2000 Interchange Agreement between BNSF and TCRY, which was in effect
during negotiations for the Railroad Lease, specifically reserved BNSF's
rights under the 1947 and 1961 Agreements.  *See* ECF No. 197, Ex. H ("[The
interchange designation] does not limit BNSF's usage of trackage as
provided under separate agreements dated November 6, 1947, and January
24, 1961, as supplemented and modified.").

ORDER * 17

Indenture.   Yet, Railroad Lease Paragraph 7.4 prohibited TCRY from unilaterally "amend[ing], modify[ing], terminat[ing] or invalidat[ing] any existing contracts which the Port has with any other railroad carrier, without the Port's prior written consent."  ECF No. 174, Ex. M, ¶ 7.4.   And TCRY was required to "continue to provide rail access to areas currently served by the railroad unless the Port and Tenant mutually agree that such access is no longer practicable."  *Id*.

Thus, from the face of the Railroad Lease Paragraph 7.4, BNSF and UP have a right to operate directly on the Richland Trackage and the Port retained the right to terminate those rights.   TCRY was aware of this and unsuccessfully sought to have Paragraph 7.4 removed from the Railroad Lease before executing it.   Having executed the Railroad Lease with Paragraph 7.4, TCRY, a sophisticated business, accepted the rights of BNSF and UP to operate on the tracks.

Mr. Keller, who executed the Railroad Lease on the Port's behalf, claims that Paragraph 7.4 was included to make clear that TCRY could not interfere with the Port's pre-existing contractual relationships with UP and BNSF.   That is, the Port intended to make clear that UP and BNSF would continue to have "equal joint" operating rights secured by the 1947 and 1961 Agreements after TCRY and the Port entered into the Railroad Lease.   TCRY's Mr. Peterson maintains that this language has nothing to do with the exclusive access to the tracks; rather, it relates to TCRY's right to directly "amend, modify, terminate or invalidate" contracts between the Port and the Railroads, which it did not do.

The circumstances surrounding the making of the Railroad Lease indicate that the Port's interpretation is the only reasonable one.   TCRY and BNSF had been operating under an Interchange Agreement since 2000;

ORDER * 18

BNSF was not directly operating on the Richland Trackage during negotiations. Also during negotiations, TCRY was engaged in a dispute with BNSF over BNSF's use of the Richland Trackage. Two years earlier, TCRY had been engaged in a similar dispute with UP. Mr. Peterson sought the removal of language in Paragraph 7.4; specifically, language that TCRY "shall not take any actions which will amend, modify, terminate or invalidate any existing contracts which the Port has with any other railroad carrier, without the Port's prior written consent." Despite BNSF and TCRY's continuing disagreement on this point, Mr. Peterson voluntarily signed the Railroad Lease on behalf of TCRY and agreed that it would not "amend, modify, terminate or invalidate" any agreements the Port had with the Railroads.

When TCRY blocked BNSF's access to the Richland Trackage, it took action which in effect amended, modified, terminated, or invalidated the Port's existing contractual relationship with BNSF: it blocked BNSF from exercising its right to operate on the tracks, a right secured by the 1947 and 1961 Agreements and subject to termination only by the Port. To adopt TCRY's interpretation of Paragraph 7.4 would render Paragraph 7.4 ineffective and meaningless. *Cambridge Townhomes, LLC v. Pac. Star Roofing, Inc.*, 166 Wn.2d 475, 487 (2009) ("Courts should not adopt a contract interpretation that renders a term ineffective or meaningless."). TCRY's motion for summary judgment regarding breach of contract is denied.

**D.    The Port's Motion for Partial Summary Judgment Against TCRY**

The Port seeks summary dismissal of TCRY's six counterclaims[6] against the Port, claiming that that TCRY's quiet use and enjoyment right was taken subject to the concurrent rights of other railroads operating on it, namely BNSF and UP.  TCRY disagrees, contending that when BNSF decided to begin running direct on the Richland Trackage, the Port was obligated under the Railroad Lease to protect TCRY's right to quiet use and enjoyment by either 1) terminating the 1947 and 1961 Agreements or 2) compensating TCRY for the damage to its property right.

Central to each of TCRY's counterclaims is the property right of quiet enjoyment conveyed to TCRY by the Port in Railroad Lease Paragraph 23.8:

> QUIET POSSESSION.  The Port agrees that upon compliance with the terms and conditions of this Lease, the Tenant shall at all times have the right to the quiet use and enjoyment of the Property for the term of the Lease and any extension.

The parties agree that Paragraph 23.8 Railroad Lease conveyed to TCRY the right to quiet use and enjoyment of the Richland Trackage for the Railroad Lease's duration-it contains no express limitation on TCRY's property right of quiet enjoyment.  Yet, the parties disagree as to whether Paragraph 7.4 impliedly limits this right by requiring TCRY to allow railroads to directly operate on the Richland Trackage without interchanging with it.

---

[6]  TCRY's six counterclaims are for inverse condemnation, breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, quantum meruit, and tortious interference.  ECF No. 165.

Viewing the entire circumstances under which the Railroad Lease was made in a light most favorable to TCRY, TCRY fails to present a reasonable construction of the Railroad Lease that precludes summary judgment. As stated above, BNSF and UP have a right to operate directly on the Richland Trackage. Only the Port had the right to terminate BNSF and UP's right to use the Richland Trackage, a right which it retained and did not grant to TCRY under Railroad Lease Paragraph 7.4. Indeed, it could not do so: the Port accepted the United States' obligations under the 1947 and 1961 agreements to provide continued use without charge to BNSF and UP under the Indenture.

Mr. Peterson claims he would not have executed the Railroad Lease for TCRY if Paragraph 7.4 limited this right to quiet enjoyment, which he believes included the right to require others to interchange with TCRY: such agreement makes no economic sense because UP and BNSF's direct operation would increase its maintenance burden without compensation. ECF No. 197, ¶ 37-39. But the record shows he tried to negotiate removal of Paragraph 7.4 and when the Port refused to remove it, Mr. Peterson, a shrewd, sophisticated executive of TCRY, with undisputed authority, executed the Railroad Lease.

The record before the Court shows at the time of negotiations, TCRY and BNSF were operating under an Interchange Agreement at the time of negotiations: BNSF was not directly operating on the Trackage from 2000 to 2009, though it had the right to do so. Also during lease negotiations, TCRY was engaged in a dispute with BNSF over TCRY's charges to BNSF for its use of the Richland Trackage. Two years earlier, TCRY had been engaged in a similar dispute with UP regarding UP's use of the

ORDER * 21

Richland Trackage, at which time the Port recognized that TCRY would make money by operating the railroad and directed TCRY to notify UP it was terminating its rights to use the Trackage.   There is no evidence that the Port made any representations – either within the Railroad Lease or during negotiations – that it would terminate its existing agreements with the Railroads or reimburse TCRY for maintenance costs.   Nor could that be a rational interpretation of the Railroad Lease or any paragraph therein, particularly Paragraph 23.8.   The fact that the Port agreed to terminate UP's right to use the Richland Trackage two years earlier is insufficient for the Court to create an issue of fact as to whether the parties intended that the Port would either terminate BNSF's rights to use or compensate TCRY for the damages if BNSF began exercising its right to directly use the Richland Trackage: it is simply not informative on that point.

The Port's contention that TCRY's right to quiet enjoyment was taken subject to the limitations imposed by the preexisting rights of BNSF and UP pursuant to the 1947 and 1961 Agreements is, on the other hand, reasonable.   When interpreting a contract, a court should "harmonize clauses that seem to conflict. [The court's] goal is to interpret the agreement in a manner that gives effect to all the contract's provisions." *Nishikawa v. U.S. Eagle High, LLC*, 138 Wn. App. 841, 849 (2007).   But if Paragraph 23.8 granted TCRY an unlimited, unqualified right of quiet enjoyment that allowed it to exclude others from directly using the tracks, then Paragraph 7.4 would be rendered ineffective and meaningless because it would not allow UP and BNSF to run directly on the Richland Trackage without paying a fee.   *See Cambridge Townhomes, LLC*,

166 Wn.2d at 487.   Read together, rather than in isolation, Paragraph 23.8 and Paragraph 7.4 can only be reasonably read to grant TCRY a right to quiet enjoyment of the Richland Trackage, subject to the limitations imposed by the preexisting rights of BNSF and UP pursuant to the 1947 and 1961 Agreements.

Given the circumstances existing at the time the Lease was executed, the only reasonable interpretation of the Railroad Lease is that Paragraph 23.8 did not grant TCRY an unlimited, unqualified right to quiet enjoyment; rather, that right was taken subject to UP and BNSF's continued use of the Richland Trackage, as secured by the 1947 and 1961 Agreements, promised by the Port under the Indenture, and agreed to by TCRY under Paragraph 7.4 of the Railroad Lease.   Accordingly, the Port's motion for summary judgment is granted; TCRY's counterclaims for inverse condemnation, breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, quantum meruit, and tortious interference are dismissed.

**E.  TCRY's Motion to Remand**

TCRY moves to remand its inverse condemnation claim to Benton County Superior Court for adjudication where it was originally asserted because it involves unique questions of state constitutional law.   Both the Port and BNSF oppose the motion.   TCRY filed an inverse condemnation action against the Port in Benton County Superior Court, which was subsequently stayed pending resolution of factual issues surrounding the Lease in this Court.   After the Port filed its Amended Complaint in this Court, TCRY

asserted its inverse condemnation counterclaim,[7] so as not to abandon what may be a compulsory counterclaim.

Under Washington law, only a judge of the Superior Court "preside at the trial to determine the compensation and damage to be awarded," and such trial shall occur in the courthouse of the county where the property interest was allegedly taken. RCW 8.04.110 & RCW 8.04.080. Yet, federal courts exercise supplemental jurisdiction over inverse condemnation claims. *See, e.g., White v. Cnty. of Newberry, S.C.*, 985 F.2d 168, 172 (4th Cir. 1993) (supplemental jurisdiction over a state inverse condemnation claim); *Patel v. Penman*, 103 F.3d 868, 877-78, *overruled on other grounds by*, *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006) (9th Cir. 1996) (supplemental jurisdiction over inverse-condemnation claim declined only after against all but one federal claims were granted).

As this Court has already acknowledged, this is a contract dispute over which federal courts have jurisdiction. *See* ECF No. 93, at 4 (citing *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 220 (4th Cir. 2009)). Under 28 U.S.C. § 1367(c), a district court has supplemental jurisdiction over claims "that are so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy." It may decline to exercise supplemental jurisdiction only if: 1) novel or complex state-law issues are raised; 2) the state claim "substantially predominates" over the

---

[7] In asserting this counterclaim, TCRY questioned wether this Court had jurisdiction over it.

federal jurisdiction claims; 3) the federal jurisdiction claims have been dismissed; or 4) in "exceptional circumstances" when there are "other compelling reasons" to decline.  28 U.S.C. § 1367(c).

At this juncture, TCRY's inverse-condemnation counterclaim neither presents a novel or complex state-law issue nor predominates over the issues still to be resolved by this Court.  Breach-of-ontract claims remain and predominate over TCRY's inverse-condemnation claim.  TCRY's counterclaim for inverse condemnation is based upon an illegal taking or damaging of TCRY's property right of quiet enjoyment under RCW 53.08.110, which was secured by Paragraph 23.8 of the Railroad Lease.  ECF No. 165. The Court has determined that Paragraph 23.8 did not grant TCRY an unlimited, unqualified right to quiet enjoyment, a premise which underlies all TCRY's counterclaims, including its claim for inverse condemnation.  Thus, no novel or complex state law issues remain; and a Superior Court Judge need not preside at the condemnation trial to determine the compensation and damage to be awarded.  Accordingly, TCRY's motion to remand is denied as moot.

Accordingly, **IT IS HEREBY ORDERED**:

1.  TCRY's Objection and Motion to Strike Portions of Declaration of Scott Keller, **ECF No. 167,** is **GRANTED** (as to what Mr. Peterson "fully understood") and **DENIED** (as to what the Port "made clear" to Mr. Peterson and whether Mr. Peterson "sought the removal" of certain language in what was then Paragraph 7.3 in the draft Railroad Lease) **IN PART**.

2.  The Port's Motion to Strike Supplemental Peterson Declaration, **ECF No. 225,** is **DENIED**.

3.  TCRY's Motion for Summary Judgment Against the Port of Benton, **ECF No. 142**, is **DENIED**.

4.  The Port's Motion for Partial Summary Judgment, **ECF No. 171**, is **GRANTED**.

5. TCRY's Motion for Remand, **ECF No. 200**, is **DENIED as moot.**

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and distribute copies to counsel.

**DATED** this   1st   day of July 2011.


                        s/Edward F. Shea
                     EDWARD F. SHEA
                United States District Judge

Q:\Civil\2009\5062.SJ.wpd

ORDER * 26