UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

BNSF RAILWAY COMPANY,

     Plaintiff,

UNION PACIFIC RAILROAD
COMPANY, and PORT OF BENTON,

     Plaintiff-Intervenors,

          v.

TRI-CITY & OLYMPIA RAILROAD
COMPANY LLC,

     Defendant.

NO. CV-09-5062-EFS

**ORDER GRANTING BNSF'S MOTION FOR SUMMARY JUDGMENT, DENYING TCRY'S MOTION FOR SUMMARY JUDGMENT, AND DENYING ALL OTHER PENDING MOTIONS AS MOOT**

Before the Court, without oral argument, are Plaintiff BNSF Railway Company's (hereinafter "BNSF") Motion for Summary Judgment, ECF No. 267, and Defendant Tri-City & Olympia Railroad Company LLC's (hereinafter "TCRY") Motion for Summary Judgment, ECF No. 273. Also before the Court are BNSF's Motion to Compel Discovery Propounded to Defendant Tri-City & Olympia Railroad Company, L.L.C., ECF No. 305, and TCRY's Motion for Protective Order, ECF No. 316. After reviewing the submissions of the parties and applicable authority, the Court is fully informed. For the reasons discussed below, the Court grants BNSF's Motion for Summary Judgment, denies TCRY's Motion for Summary Judgment, and denies all other pending motions as moot.

ORDER * 1

## I.    BACKGROUND[1]

### A.    1947 Agreement

On November 6, 1947, the United States, acting through the U.S. Atomic Energy Commission ("Commission"), entered into an agreement ("1947 Agreement") with several railroads to establish service to the Hanford Nuclear Reservation ("Hanford site").  BNSF and Union Pacific Railroad Company ("UP"), the undisputed successors-in-interest to the 1947 Agreement, were granted "equal joint" operating rights over trackage beginning near Kennewick and extending north of Richland to the Hanford site ("Richland Trackage").

The 1947 Agreement identifies the rights of the parties to railway lines as shown on an August 25, 1947 map attached to the Agreement as "Exhibit A."  The 1947 Agreement acknowledges that "the Government has constructed on its property a line of railway . . . extending from

---

[1]    In connection with their motions, the parties submitted Joint Statements of Uncontroverted Facts.  ECF Nos. 281 & 294.  The Court treats these facts as established consistent with Federal Rule of Civil Procedure 56(d), and sets these forth in this "Factual Background" section without reference to an ECF number.  Any disputed facts are supported by a citation to the record.  The Court has reviewed the record supporting the parties' cross-motions for summary judgment, and finds that there are no issues of material fact precluding summary judgment.  *See Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (discussing district court's duty to review the record when ruling on cross-motions for summary judgment).

ORDER * 2

Hanford, Washington, southerly to a point near the north bank of the Yakima River," and states as its purpose that "the Government desires to have a direct rail connection to the south so as to interchange business with [BNSF and UP's predecessors in interest]."  To this end, Article V of the 1947 Agreement grants BNSF and UP's predecessors in interest the "equal joint right" to operate on the rail line and "to use said interchange facilities and wye for the purpose of interchanging business with the Government."  Article VII of the Agreement states that BNSF and UP's predecessors in interest "each of itself agrees to deliver and receive at said interchange facilities all business which either is obligated to transport as a common carrier railroad."  Article IX of the Agreement imposes an obligation on BNSF and UP's predecessors to "agree from time to time upon rules and regulations covering the movement of engines, cars and trains over the line B-E and on said interchange facilities."

The map attached to the 1947 Agreement identifies several points, labeled A through E.  Point A is in Kennewick, and points B, C, and D extend along the rail line in a northwesterly direction toward the Hanford site.  The map identifies point E as a location to the north of Richland upon which interchange tracks were to be built.  The government later constructed an interchange facility at Point E, and today, Point E is TCRY's rail yard and is still operated as an interchange facility. Though the 1947 map identified a location to the south of the interchange tracks for the wye, the wye was in fact later built to the north of the interchange tracks.[2]

---

[2] A wye is a triangular arrangement of rail tracks designed to allow

ORDER * 3

In 1948, the 1947 Agreement was the subject of a ruling by the Interstate Commerce Commission (ICC). Because the government was the only "customer" served by BNSF and UP's predecessors, the railroads sought exemption from the required public convenience and necessity certifications for common rail carriers. The ICC's Order held that a certificate *was* required because the railroads would also provide common carrier services to businesses in and around Richland. The ICC's Order modified terms in the 1947 Agreement regarding payment and rights to termination, but left the remainder of the Agreement undisturbed.

## B.    1961 Agreement

In 1961, the Commission entered into a second agreement ("1961 Agreement") with the Railroads. Section 1 of the 1961 Agreement leased three specified areas of track to the railroads. Section 2 of the Agreement granted "the Railroads, and the industries served by them, the right to construct additional industrial spur, set-out, and such other tracks connecting with the Government's main tracks or classification yards as may be required to provide rail service for industries." Section 3 of the 1961 Agreement states as follows:

> The Commission hereby grants the Railroads the right to operate with their employees and equipment over such segments of the Government's tracks shown on Exhibit "A" as it may be necessary to use for the purpose of moving freight shipments to or from the tracks covered by this agreement.

Section 3's grant of authority was consistent with the agreement's stated purpose of allowing the railroads to operate on the United States' tracks "for the sole purpose of receiving and delivering shipments routed via the

---

railway equipment to change direction by performing a "three-point turn."

ORDER * 4

Railroads and consigned by or to shippers and receivers located on said spur or side tracks."

The rail line depicted in a 1960 map attached as Exhibit A to the 1961 Agreement begins south of Richland at the Yakima River Bridge, and extends to a Department of Energy (DOE) "barricade" roughly one thousand feet north of the wye tracks. The three segments of track leased in the 1961 Agreement are all south of the interchange facility and wye.

In 1979, the United States entered into an agreement with the railroads converting the 1961 lease agreement into a permit so that the tracks could be classified as surplus under the Federal Property and Administrative Services Act of 1949. This agreement deleted Sections 1 and 4 of the 1961 Agreement, which detailed the terms of the lease and the railroads' maintenance obligation, but left the 1961 Agreement's other provisions "in full force and effect."

C.    1998 Indenture

In 1998, the United States, acting through the DOE, conveyed ownership of a six-mile section of track to the Port of Benton ("Port") through an Indenture, thereby assigning the DOE and Commission's rights under the 1947 and 1961 Agreements to the Port. The indenture stated that the 1947 and 1961 Agreements and the 1979 permit agreement governed access to the Railroad. The Indenture also stated that the Port, as assignee, agreed to be bound by the obligations and considerations in the United States' permit. As a result of these agreements, the Port has the right to terminate BNSF and UP's rights to use the Richland Trackage upon six months notice.

/

ORDER * 5

### D.   Interchange Agreement

On October 1, 1998, the Port entered into a Maintenance and Operation Agreement with TCRY's predecessor, Livingston Rebuild Center, Inc. ("Livingston"), under which it agreed to pay Livingston $325,000 per year for the maintenance of the Richland Trackage.  These contractual rights and obligations were subsequently assigned to TCRY.

In May 2000, BNSF and TCRY contracted to interchange cars going into the Richland Trackage ("Interchange Agreement").  They exchanged cars at the Richland Junction, and TCRY served BNSF's customers along the Richland Trackage.  TCRY maintained the trackage at its own expense and began charging a per-car fee for its services.  This contract specifically reserved BNSF's rights under the 1947 and 1961 Agreements.

In a September 12, 2000 letter to then-TCRY President John Haakenson, the Port's Assistant Executive Director Scott Keller acknowledged that the Port was paying TCRY to maintain the railroad under a contract that allowed TCRY to charge a fee for its railroad operations, the revenue from which would offset the cost of maintenance.  Recognizing that UP was using the Richland Trackage without paying a fee, the Port directed TCRY "to give written notice to [UP] terminating its rights to use the Port of Benton track."  Beginning November 14, 2000, UP could no longer continue its unauthorized use of the Richland Trackage: it would need to establish an interchange agreement with TCRY.

From approximately April 2001 through November 2001, TCRY and BNSF continuously disagreed about BNSF's right to operate on the Richland Trackage.  BNSF claimed the 1947 and 1961 Agreements allowed it to directly operate on the Richland Trackage without interchanging; TCRY

ORDER * 6

maintained that BNSF could only operate on the Richland Trackage if it operated under the Interchange Agreement. This disagreement about BNSF's rights to operate on the Richland Trackage forms the essential controversy before the Court today.

**E.    Railroad Lease**

In 2002, TCRY and the Port negotiated a lease agreement ("Railroad Lease") that authorized TCRY to provide rail and track maintenance services on the Richland Trackage. Paragraph 7.4 of the lease agreement states that TCRY "shall not take any actions which will amend, modify, terminate or invalidate any existing contracts which the Port has with any other railroad carrier, without the Port's prior written consent."

**F.    Legal Action**

In 2009, BNSF informed TCRY that it intended to exercise its rights to directly operate on the Richland Trackage. TCRY objected, and on July 20 and 21, 2009, TCRY erected a barrier which physically prevented a BNSF locomotive from reaching BNSF customers along the Richland Trackage. A few days later, TCRY requested that the Port terminate the Richland Trackage agreements with BNSF. The Port refused.

BNSF filed this suit on July 20, 2009. ECF No. 1. UP moved to intervene on August 4, 2009, ECF No. 26, and the Court granted UP's motion. ECF No. 46. On August 12, 2009, the Court granted BNSF's motion for a preliminary injunction, prohibiting TCRY from blocking BNSF's access to the Richland Trackage and requiring TCRY to charge its customary fee. ECF No. 46 & 93. TCRY filed an interlocutory appeal on September 9, 2009, which was voluntarily dismissed. ECF Nos. 67, 101, 108 & 109. Since August 15, 2009, BNSF and TCRY have been operating under the Proposed

ORDER * 7

Operating Plan created to comply with the Court's preliminary injunction. ECF No. 52.

On March 8, 2010, the Court granted the Port of Benton's request to intervene. ECF No. 121. On June 2, 2010, TCRY filed a separate but related action in Benton County Superior Court against the Port, asserting claims for inverse condemnation, breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, and quantum meruit. ECF No. 209-1. By order dated August 20, 2010, the Superior Court stayed the state court action pending resolution of the federal claims in this Court. ECF No. 209-2.

On September 29, 2010, the Port amended its complaint, asserting that TCRY breached Railroad Lease Paragraph 7.4, which prohibits TCRY from "amend[ing], modify[ing], terminat[ing], or invalidat[ing]" other railroads' existing contractual relationships with the Port, when it temporarily blocked BNSF Railroad Company (BNSF)'s access to the Richland Trackage in July 2009. ECF No. 136. TCRY asserted several counterclaims against the Port, including inverse condemnation, breach of contract, breach of implied covenant of good faith and fair dealing, promissory estoppel, quantum meruit, and tortious interference with contract. ECF No. 165, ¶¶ 18-24.

TCRY filed a motion for summary judgment on October 20, 2010, seeking dismissal of the Port's Amended Complaint. ECF No. 142. On November 24, 2010, the Port moved for summary dismissal of TCRY's counterclaims. ECF No. 171. TCRY then moved on December 17, 2010, to remand the inverse condemnation claims to state court for determination where they were originally asserted. ECF No. 200. On July 1, 2011, the Court denied

ORDER * 8

TCRY's Motion for Summary Judgment and Motion for Remand. ECF No. 264. The Court's Order granted the Port's Motion for Partial Summary Judgment, dismissing TRCY's counterclaims against the Port. *Id.* In denying TCRY's Motion for Summary Judgment, the Court found that under the 1947 and 1961 Agreements, BNSF and UP have "equal joint" rights to operate directly upon the Richland Trackage, and that TCRY took its lease of the Richland Trackage subject to BNSF and UP's rights. *Id.*

TCRY and BNSF now both move for summary judgment regarding the nature and extent of BNSF and UP's rights to operate on the Richland Trackage. ECF Nos. 267 & 273.  TRCY asserts that BNSF and UP's rights under the Agreements are limited to use of the trackage only up to the interchange, or alternatively, the wye, and that BNSF may use those portions of track for interchange purposes only.  BNSF argues that their right to operate directly extends to all Richland Trackage south of the old Department of Energy barricade, and is subject only to the limitation that it be used "for the purpose of moving freight shipments." After reviewing the record in this matter, the arguments of the parties, and applicable authority, the Court is fully informed.  Because the 1947 and 1961 Agreements give BNSF and UP the right to operate directly on the entirety of the Richland Trackage, the Court denies TRCY's motion and grant BNSF's motion.

**III.  DISCUSSION**

    **A.  Summary Judgment Standard**

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Once a

ORDER * 9

party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322.  When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.  When ruling on cross-motions for summary judgment, the Court has a duty to review the record supporting the parties' motions and to determine whether there are issues of material fact precluding summary judgment.  *Fair Housing Council of Riverside Cnty., Inc.*, 249 F.3d at 1136.

Here, both TRCY and BNSF have moved for summary judgment.  Both parties agree that there are no genuine issues of material fact, and after reviewing the record in this matter, the Court finds that there are none.  Summary judgment is thus appropriate if either party is entitled to judgment as a matter of law.

**B.   Applicable Law**

When interpreting a contract under Washington law, the Court attempts to "ascertain the parties' intentions and give effect to their intentions." *Taylor-Edwards Warehouse & Transfer Co. of Spokane, Inc. v. Burlington N., Inc.*, 715 F.2d 1330, 1334 (9th Cir. 1983) (citing *Jones v. Hollingsworth*, 88 Wn.2d 322, 326 (1977)).  Under Washington law, extrinsic evidence is only admissible "as to the entire circumstances under which

the contract was made, as an aid in ascertaining the parties' intent." *Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990).  When a contract is unambiguous and its formation is undisputed, the interpretation of the contract is a question of law that is appropriate for resolution on summary judgment.  *See, e.g.*, *Mfg'd Hous. Cmtys. of Wash. v. St. Paul Mercury Ins. Co.*, 660 F. Supp. 2d 1208, 1212 (W.D. Wash. 2009) (citing *Mayer v. Pierce Cnty. Med. Bureau*, 80 Wn. App. 416, 420 (1995)).

**C.   The Parties' Positions**

TCRY concedes that BNSF has the right to operate directly on a portion of the Richland Trackage, but argues that language in the 1947 Agreement geographically restricts the United States' grant to BNSF and UP's predecessors to direct service between points "C" and "E" on the map attached as Exhibit A to the 1947 Agreement.  Because point "E" on Exhibit A to the 1947 Agreement is the present-day site of TCRY's interchange facility, TCRY argues that BNSF and UP should be enjoined from directly serving points north of the interchange facility, and should be required to interchange with TCRY in order to serve customers north of the interchange facility.  Alternatively, TCRY argues that BNSF and UP's operating rights should terminate at the wye built a short distance north of the interchange facility.

TCRY also asserts, in an argument developed primarily in its reply memorandum, that the 1947 Agreement only grants the railroads rights to use trackage between points "C" and "E" on Exhibit A for the purpose of interchanging rail traffic with the government, and not to provide direct rail service to customers along that track.  Finally, TCRY argues that it would be unfair to allow BNSF and UP to directly service customers north

ORDER * 11

of the interchange facility because pursuant to the 1998 Maintenance and Operation Agreement, it is charged with the sole responsibility for maintaining the Richland Trackage. TCRY requests a permanent injunction prohibiting BNSF and UP from traveling north of its interchange facility.

BNSF argues that because the wye pictured in Exhibit A to the 1947 Agreement was later built to the north of the interchange facility (instead of to the south as represented in Exhibit A), the 1947 Agreement does in fact grant the railroads operating rights north of the interchange facility. BNSF further argues that Sections 2 and 3 of the 1961 agreement extended the Railroads' operating rights to the entirety of the Richland Trackage, limited only by the broad requirement that their operations be for the purpose of "moving freight shipments."[3] BNSF requests a

---

[3] BNSF also argues that TCRY's argument is foreclosed by the law of the case. However, the Court's September 28, 2009 Order Granting BNSF's Motion for Preliminary Injunction expressly stated that the Court's preliminary injunction ruling was "not binding on the Court in future proceedings in this case." ECF No. 93 at 2; *see also Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984) (recognizing that trial court's findings regarding a party's probability of success on the merits are not binding on future stages of the case). Furthermore, while the Court's July 1, 2011 Order held that TRCY leasehold rights were "subject to UP and BNSF's continued use of the Richland Trackage, as secured by the 1947 and 1961 Agreements," ECF No. 264 at 23, the question of the exact nature and extent of the parties' rights over the Richland Trackage was not then before the Court.

ORDER * 12

declaratory judgment recognizing its operating rights over the Richland Trackage and a permanent injunction compelling TCRY to afford it equal access to the Richland Trackage.

Intervenor-Plaintiff UP does not oppose BNSF's motion, but asks that any ruling on the motion protect the "equal, just, and fair" operating rights to the Richland Trackage that it was granted by the 1947 Agreement. UP also asserts that BNSF does not have the right to provide direct rail service to the Hanford site, but that BNSF's direct rail service rights instead terminate somewhere between TCRY's interchange facility and Hanford.

### D.    Analysis

#### i.    BNSF's Operating Rights on the Richland Trackage

On close review of the underlying agreements, it is apparent that BNSF's reading of the 1947 and 1961 Agreements is the correct one. While the 1947 Agreement's grant to BNSF and UP's predecessors in interest is explicitly limited to the "right to operate . . . between points B and E, and to use said interchange facilities and wye for the purpose of interchanging business with the government," ECF No. 32-2 at 13, this agreement was speculative and referenced trackage that had yet to be built. *See id.* at 12 (the Commission shall lay track in "*approximately* the location shown in yellow on said exhibit," and shall build an interchange and wye "*in the vicinity* of point E." (emphasis added)). At the time the 1947 Agreement was drafted, the United States was the only shipper on this section of track, and security concerns prevented private access to the Hanford site; thus, the Agreement's reference to point "E" appears to be intended to demarcate a convenient place for interchange,

rather than to provide an affirmative limitation on the railroads' later ability to service rail customers.  But regardless of the exact intent behind the 1947 Agreement, the 1961 Agreement greatly expands the United States' grant to BNSF and UP.

The 1961 Agreement has the stated purpose of allowing the railroads to "receiv[e] and deliver[] shipments routed via the Railroads and consigned by or to shippers and receivers" located on spur or side tracks connecting to the United States' tracks.  ECF No. 32-3 at 62.  As noted above, Section 3 of the 1961 Agreement states as follows:

> The Commission hereby grants the Railroads the right to operate with their employees and equipment over such segments of the Government's tracks shown on Exhibit "A" as it may be necessary to use for the purpose of moving freight shipments to or from the tracks covered by this agreement.

*Id*. at 63.  Exhibit A to the 1961 Agreement is a detailed map depicting the entirety of the Richland Trackage, minus the subsequently-built Port trackage and spurs extending west from the wye.  The above-quoted language grants BNSF and UP broad operating rights over the Richland Trackage, and bulwark's BNSF's position.

TCRY makes much of Section 3's limitation that the railroads may only use such segments of the tracks as may be necessary to access "the tracks covered by this agreement."  TCRY argues that because Section 1 of the agreement, which contains the operative language of the lease, lists only sections of track *south* of the interchange facility, the "tracks covered by this agreement" are all south of the interchange, and thus Section 3's grant does not extend north of the interchange or wye.  Section 2 of the agreement, however, also grants "the Railroads, and industries served by them," the right to construct additional "industrial spur, set-out, and

ORDER * 14

1    such other tracks connecting with the Government's main tracks or

2    classification yards as may be required to provide rail service for

3    industries." *Id*. It seems readily apparent that the Port's spur tracks

4    are "industrial spur, set-out, and such other tracks" that were

5    constructed by "the industries served by [the railroads]" as the phrase is

6    used in the 1961 Agreement. These subsequently-built tracks are thus

7    "tracks covered by" the 1961 Agreement, and it follows logically that

8    Section 3 also grants BNSF and UP the right to serve customers on these

9    later-built sections of Port trackage and spurs extending west of the wye.

10

11    TCRY also argues that Section 3's reference to "tracks shown on

12    Exhibit 'A'" precludes a reading of the 1961 Agreement that grants BNSF

13    and UP rights relating to tracks built after the Agreement, because they

14    by definition could not be shown on Exhibit A. But Section 3's reference

15    to "tracks shown on Exhibit 'A'" relates to the section of track over

16    which BNSF and UP are afforded rights, not the Section's later use of the

17    phrase "tracks covered by this agreement;" these tracks are precisely the

18    tracks over which BNSF and UP seek access. This interpretation of the

19    1961 Agreement is supported by its stated purpose of opening up the

20    Richland Trackage to common carrier rail service in order to promote

21    industrial development in the Richland area. Of course, BNSF and UP's

22    right to use the Richland Trackage may only be "for the purpose of moving

23    freight shipments."

24    /

25    Accordingly, the Court finds that the 1961 Agreement grants BNSF and

26    UP the right to operate directly on the Richland Trackage. This right

ORDER * 15

extends north of the TCRY interchange facility, and includes both the spur tracks to the west of the wye and the main-line tracks north to Horn Rapids Road.  Neither BNSF nor UP has a right to serve the Hanford site directly.

### ii.  UP's Operating Rights on the Richland Trackage

UP's position is clearly supported by the 1947 Agreement.  The 1947 Agreement grants both BNSF and UP's predecessors in interest "the equal joint right" to operate on the relevant section of track.  ECF No. 32-2 at 13.  This grant includes the future-looking assurance that "any right or privilege at any time granted by the Commission to one of said companies in respect to its operations shall be a right or privilege which the other company may at its option exercise in respect to its operations." *Id*.  Furthermore, the Agreement requires BNSF and UP's predecessors to "agree from time to time upon rules and regulations" for the use of the Richland Trackage, and requires that such rules and regulations "shall be equal, just, and fair," and "shall not unjustly discriminate against either." *Id*. at 14.  These portions of the 1947 Agreement have not been modified by later agreement, and remain in force today.  As such, the Court includes UP in any declaratory or injunctive relief it affords BNSF.

### E.  Relief Granted

### i.  Declaratory Judgment

Under the Declaratory Judgment Act, 28 U.S.C. § 2201, declaratory judgment is proper when one party has established that "there is a substantial controversy, between parties having adverse interest, of sufficient immediacy and reality to warrant issuance of a declaratory

judgment." *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 658 (9th Cir. 2002) (quoting *Western Min. Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Here, the factual background of this case unquestionably demonstrates that such a controversy exists and that declaratory judgment is proper.

BNSF requests a declaratory judgment recognizing its rights to provide direct rail service over the Richland Trackage.[4]  For the reasons discussed above, the Court grants BNSF's request in this regard, and issues a declaratory judgment recognizing both BNSF and UP's rights to provide direct rail service over the Richland Trackage.

### ii. Permanent Injunction

BNSF also requests a permanent injunction compelling TCRY to allow it access over the Richland Trackage and requiring TCRY to coordinate train scheduling and dispatching with BNSF and UP.

Permanent injunctive relief is proper when a party can show "(1) that is has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v.*

---

[4] TCRY argues that BNSF's requested relief must be denied because BNSF failed to name the Port and UP, who are necessary parties under Federal Rule of Civil Procedure 19.  However, any argument that BNSF has improperly failed to join the Port and UP was rendered moot when they intervened in this lawsuit.

ORDER * 17

*MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  The first factor, the existence of irreparable injury, is also satisfied by a continuing and imminent threat of harm.  *See, e.g.*, *Bowler v. Home Depot USA Inc.*, No. C-09-5523 JCS, 2011 WL 166140, at *3 (N.D. Cal. January 19, 2011) (citing *Monsanto Co. v. Geertson Seed Farms*, 130 S.Ct. 2743, 2760 (2010)).  The decision to grant or deny permanent injunctive relief is within the Court's discretion.  *See eBay Inc.*, 547 U.S. at 391 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)).

Here, BNSF fulfills the first two factors because the percipient loss of customer goodwill that will occur if TCRY again blocks it from accessing the Richland Trackage is imminent; the loss of consumer goodwill is an irreparable injury, and legal remedies are inadequate to compensate for that injury.  *See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991); *Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 519-20 (9th Cir. 1984).  The balance of hardships between BNSF and TCRY also runs in BNSF's favor:  While TCRY is currently tasked with maintaining the Richland Trackage under the 1998 Maintenance and Operation Agreement and the 2002 Lease, as the Court has already found, TCRY took possession of the Richland Trackage subject to BNSF and UP's pre-existing rights; the temporary hardship TCRY will suffer under its contract with the Port is outweighed by the long-term hardship BNSF and UP would suffer if their rights under the 1947 and 1961 Agreements were permanently abrogated. Finally, as the Court found in its Order granting BNSF's motion for a preliminary injunction, ECF No. 93 at 10-11, it is in the public interest to encourage competition among the

ORDER * 18

railroads and to ensure that railroad service remains efficient. Accordingly, a permanent injunction is proper.

TCRY argues that if such relief is granted, the injunction should not be "asymmetrical." TCRY cites *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010), in support of this position, but this case mentions no such consideration, and simply affirms a district court's preliminary injunction issued under the *Winter* framework. TCRY asserts that an order enjoining only it would be unfair because it would "give[] only one party the asymmetric right to seek an order of contempt over any claim of contract breach." ECF No. 283 at 15. However, only TCRY is in breach of the 1947 and 1961 Agreements, and BNSF has committed no harm that need be redressed with equitable relief. Furthermore, the Court's contempt power will only be available for breach of the *injunction*, and both parties will retain the ability to seek legal relief for breach of the underlying contract. As such, the Court denies TCRY's request for a "symmetrical" injunction.

For the reasons discussed above, the Court grants BNSF's request and issues a permanent injunction requiring TCRY 1) to allow both BNSF and UP to directly serve customers along the Richland Trackage, and 2) to coordinate train scheduling and dispatching with both BNSF and UP. The parties shall meet and confer to develop a comprehensive operational plan as detailed below.

**F. Conclusion**

For all of the historical complexity surrounding the Richland Trackage, the relative rights of the parties are actually quite simple:

ORDER * 19

The United States granted BNSF and UP's predecessors in interest full rights to operate on the Richland Trackage, and TCRY took possession of the Richland Trackage subject to these rights. Accordingly, the Court issues a declaratory judgment recognizing BNSF and UP's operating rights, and issues a permanent injunction protecting these rights.

Accordingly, **IT IS HEREBY ORDERED:**

1. BNSF's Motion for Summary Judgment, **ECF No. 273**, is **GRANTED.** Both BNSF and UP shall have the right to operate directly on the Richland Trackage. Representatives from BNSF, TCRY, and UP shall meet and confer at a mutually-convenient time and place – either by phone or in person – and draft a comprehensive operational plan (COP), consistent with the Court's ruling, that is signed and agreed upon by all three parties. A representative of the Port shall be permitted to attend and offer comments. The COP shall cover trackage from the Richland junction to Horn Rapids Road (and all spurs that spring therefrom). The proposed COP shall be filed for Court approval **no later than 5:00 p.m. on December 23, 2011** unless on or before that date, BNSF, TCRY, and UP file with the Court a joint stipulation to a later date. The Port shall have seven (7) days after the filing of the proposed COP in which to file a statement with the Court stating its comments or objections to the proposed COP. The parties shall have seven (7) days after the filing of the Port's statement in which to file individual or joint reply to the Port's statement. No other responsive or reply memoranda will be considered.

///

//

/

ORDER * 20

2.  All pending motions are **DENIED as moot.**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and distribute copies to counsel.

**DATED** this ___14th___ day of December 2011.


                        s/Edward F. Shea
                        EDWARD F. SHEA
                United States District Judge

Q:\Civil\2009\5062.MSJ.lc2.wpd

ORDER * 21