FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 06, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| BNSF RAILWAY COMPANY,<br><br>    Plaintiff,<br><br>UNION PACIFIC RAILROAD<br>COMPANY, and<br>PORT OF BENTON,<br><br>    Plaintiff-Intervenors,<br><br>    v.<br><br>TRI-CITY & OLYMPIA RAILROAD<br>COMPANY, LLC,<br><br>    Defendant. | No.   2:09-cv-5062-EFS<br><br><br>**ORDER DENYING DEFENDANT'S<br>MOTION TO AMEND PERMANENT<br>INJUNCTION** |

Before the Court is Defendant Tri-City & Olympia Railroad Company, LLC (TCRY)'s Motion to Amend Permanent Injunction, ECF No. 374. TCRY requests that the Court amend the Permanent Injunction previously entered by the Court on December 14, 2011, to require Plaintiff BNSF Railway Company (BNSF) and Plaintiff-Intervenor Union Pacific Railroad Company (UP) to each pay a $95/car "maintenance charge," or "tariff." TCRY also asks the Court to apply the $95/car tariff retroactively going back to the Permanent Injunction's date of entry, as reimbursement for the cars already carried over the subject trackage.

ORDER – 1

BNSF, UP, and Plaintiff-Intervenor Port of Benton (the "Port") each oppose TCRY's requested amendments.[1]  Having considered the parties' filings and oral arguments, as well as the record as a whole, the Court is fully informed and denies TCRY's motion.

## I.    BACKGROUND[2]

### A.    The 1947 and 1961 Agreements

On November 6, 1947, the U.S. government entered into an agreement with BNSF and UP's predecessors-in-interest to establish service to the Hanford Nuclear Reservation (the "1947 Agreement").  The 1947 Agreement provided that each railroad company would pay $50,000 to cover the costs of constructing a portion of what is referred to herein as the "Richland Trackage."[3]  In return, each railroad company was granted "equal joint" operating rights over those government-owned tracks "free of rental or any other charge."[4]

---

[1] *See* ECF Nos. 397–400, 407.

[2] The Court recites only the facts and procedural history directly relevant to deciding TCRY's current motion.  A more detailed history of the case may be found at ECF No. 342, as well as ECF Nos. 46, 93, 329, 343, 336-1.

[3] ECF No. 113-3 at 2–4.

[4] ECF No. 113-3 at 4 (1947 Agreement); *id.* at 19 (Sept. 28, 1948 ICC decision).  *See also Peterson v. Dep't of Revenue*, 443 P.3d 818, 821 (Wash. App. 2019), *aff'd sub nom.* 460 P.3d 1080 (Wash. 2020)) ("The [ICC] approved the 1947 Agreement and

In 1961, the U.S. government entered into another agreement with the railroads (the "1961 Agreement"). The effect of the 1961 Agreement was to extend the railroads' operating rights to the rest of the Richland Trackage.[5] For purposes of this case, the key effect of the 1947 and 1961 Agreements—together with their amendments—was to grant BNSF and UP the right to operate directly on the entirety of the Richland Trackage.

**B.     The Indenture to the Port and Subsequent Leases to TCRY**

In 1998, the Port received ownership of the Richland Trackage through an indenture from the U.S. government. That indenture provides that the 1947 Agreement, the 1961 Agreement, and the 1979 permit agreement each govern access to the Richland Trackage. The indenture was also conditioned on the Port being bound by the obligations and considerations set forth in those same agreements.

In 2002, TCRY and the Port executed a lease assigning to TCRY the Port's rights and responsibilities to operate and maintain the Richland Trackage (the Railroad Lease).[6] To ensure continued compliance with the terms of the indenture,

———————————

included in its report that 'when full payment has been made, [BNSF and UP] should thereafter be permitted to operate over the tracks without further payments.'").

[5] *See* ECF No. 342 at 12–13.

[6] *See* ECF No. 32-3.

1   the Railroad Lease included a provision that TCRY "shall not take any actions

2   which will amend, modify, terminate or invalidate any existing contracts which the

3   Port has with any other railroad carrier, without the Port's prior written consent."[7]

4          Also in 2002, TCRY and the Port executed a ground lease of a manufacturing

5   mall (the "Ground Lease").  The stated purpose of the Ground Lease in 2002 was

6   "to support the [TCRY]'s operation of the Port of Benton Railroad and to provide a

7   materials . . . lay-down yard for materials to be used by Bechtel Corporation in the

8   construction of the vitrification plant on the Hanford Site."[8]  When the Port and

9   TCRY amended the Ground Lease in 2006, however, the stated purpose changed.

10  It was no longer designed to support TCRY's operations of the Richland Trackage.

11  Under the new Ground Lease, TCRY's only allowed use of the property was to

12  sublease it to the Bechtel Corporation, and the Ground Lease's stated purpose was

13  now "to provide an area for a laydown yard, which [TCRY] will sublease to the

14  Bechtel Corporation."[9]

15  **C.    Initial Dispute and Proceedings**

16         In 2009, after BNSF informed TCRY that it intended to exercise its rights to

17  directly operate on the Richland Trackage, TCRY erected a barrier physically

18  blocking a BNSF locomotive from reaching BNSF customers along the Richland

19

20  _____

21  [7] *See* ECF No. 32-3.

22  [8] ECF No. 374-4.

23  [9] ECF No. 374-5.

Trackage.  BNSF quickly filed suit, seeking declaratory and injunctive relief to enforce its rights under the 1947 and 1961 Agreements.[10]  UP intervened early the next month.[11]

In August 2009, the Court granted BNSF's motion for a preliminary injunction, prohibiting TCRY from blocking BNSF's access to the Richland Trackage and requiring TCRY to charge only its customary fee.[12]  In March 2010, the Port intervened.[13]  In a July 2011 order, the Court found that under the 1947 and 1961 Agreements, BNSF and UP have "equal joint" rights to operate directly upon the Richland Trackage, and that TCRY took its lease of the Richland Trackage subject to BNSF and UP's rights.[14]  Still, the parties disagreed as to where BNSF and UP's rights began and ended.

**D.    The Permanent Injunction and Comprehensive Operating Plan**

On December 14, 2011, the Court granted summary judgment in favor of BNSF, again finding that the "United States granted BNSF and UP's predecessors-in-interest full rights to operate on the Richland Trackage, and TCRY took

---

[10] *See* ECF No. 1.

[11] ECF Nos. 26, 46.

[12] ECF Nos. 46, 93.

[13] ECF No. 121.

[14] ECF No. 264.

possession of the Richland Trackage subject to these rights."[15]  The Court issued

the Permanent Injunction, which requires TCRY to (1) "allow both BNSF and UP

to directly serve customers along the Richland Trackage," and (2) "coordinate train

scheduling and dispatching with both BNSF and UP."[16]  In order to effectuate the

Permanent Injunction, the Court also ordered BNSF, UP, and TCRY to confer and

"draft a comprehensive operational plan (COP), consistent with the Court's

ruling."[17]  And on February 14, 2012, upon receipt and consideration of the parties'

various proposed COPs and related arguments, the Court adopted BNSF's

proposed COP.[18]  Neither the Permanent Injunction nor the COP addressed

maintenance costs.

In July 2012, BNSF brought a motion seeking to have the Court hold TCRY

in contempt for denying BNSF access to the Port's industrial spur tracks.[19]  The

Court denied the motion in August 2012, finding that the dispute should have first

been submitted to the Port to attempt to resolve the rights of the parties pursuant

---

[15] ECF No. 329.  This order was modified on February 14, 2012, by ECF No. 342.

[16] ECF No. 342 at 1–4.

[17] ECF No. 329.  The Court's order also provided that the Port could then provide

comments regarding the other parties' proposals. *Id.*

[18] ECF Nos. 343, 336-1.

[19] *See* ECF Nos. 356–59.

to the Port's authority in paragraph 10 of the COP.[20]  Since then, until TCRY's current motion, there had been no further action in this case.

**E.    Other Litigation**

This case has not been TCRY's only litigation with BNSF, UP, and the Port. In August 2016, TCRY's majority owner filed suit in state court against the Port, alleging that "by allowing BNSF to use its tracks rent free, and without paying for the impact to the tracks from wear and tear, the Port has made an unconstitutional gift of public funds in violation of article VIII, section 7 of the Washington Constitution."[21]  The superior court's dismissal of TCRY's claims was affirmed by both Washington's court of appeals and supreme court.[22]

In 2016, TCRY also filed a complaint against the Port with the U.S. Railroad Retirement Board, alleging that the Port was a "covered employer" and defrauding the government by not making required payments under the Railroad Retirement Act and the Railroad Unemployment Insurance Act.[23]  This action also proved unsuccessful.[24]

---

[20] *See* ECF Nos. 373, 336-1.

[21] *Peterson v. Dep't of Revenue*, 443 P.3d at 823 (Wash. App. 2019), *aff'd sub nom.* 460 P.3d 1080 (Wash. 2020).

[22] *Id.*

[23] *See* ECF No. 400-1 at 5–6.

[24] ECF No. 400-1 at 6.

1    In 2017, TCRY filed a qui tam action in this Court against the Port (Case

2   No. 2:17-cv-0191-TOR), which included claims based on BNSF and UP's use of the

3   Richland Trackage and the Port not approving proposing tariffs.[25]  The Court

4   dismissed each of TCRY's federal claims, saying in one of its orders, "Even if the

5   Port had the authority to approve tariffs, Plaintiffs do not point to any provision . .

6   . requiring the Port to approve tariffs."[26]  The Court granted leave for the parties to

7   refile their state-law claims in state court.

8    In 2020, TCRY refiled in state court, alleging the Port breached the Railroad

9   Lease by, among other things, refusing to timely approve tariffs and not allowing

10   TCRY to negotiate directly with UP and BNSF.[27]  Then, in August 2020, the Port

11   filed an unlawful detainer action, which was consolidated with the breach of

12   contract matter.[28]  On May 18, 2022—after TCRY filed the subject motion in this

13   Court—the state court granted summary judgment for the Port, dismissing TCRY's

14   claims, finding TCRY breached the Railroad Lease as a matter of law, terminating

15   TCRY's tenancy in the Richland Trackage, and directing for issuance of a writ of

16   restitution.[29]

---

19   [25] ECF No. 392 at 3

20   [26] ECF No. 392-4 at 6.

21   [27] ECF No. 392-8 at 3.

22   [28] ECF No. 392 at 4–5.

23   [29] ECF No. 407-1.

**F.    TCRY's Motion to Amend the Permanent Injunction**

In January 2022, TCRY filed the instant motion.[30]  In its motion, briefing, and proposed order, TCRY requests that the Court (1) amend the Permanent Injunction "to include the required payment of TCRY's Railroad Maintenance Charge of $95 per railcar by the BNSF or UP for railcars that they directly carry over the Richland Trackage," and (2) order BNSF and UP to reimburse TCRY "in accordance with the Railroad Maintenance Charge for the number of railcars that they directly carried over the Richland Trackage since the Permanent Injunction was entered on December 14th, 2011."[31]

## II.    <u>LEGAL STANDARD</u>

The Court first addresses which legal standard applies for purposes of deciding TCRY's motion.  TCRY cites Federal Rule of Civil Procedure 60(b)(5) as the basis for its request that the Court amend the Permanent Injunction.[32]  BNSF, however, contends that TCRY's motion is truly seeking a new, independent permanent injunction and must be analyzed as such.[33]  BNSF points out that under the existing Permanent Injunction, TCRY is the enjoined party, and BNSF

---

[30] TCRY also sought—and the parties briefed—discovery, but TCRY later rescinded its discovery request. *See generally* ECF Nos. 382–95.

[31] ECF No. 374-1 at 2 (TCRY's proposed order).

[32] ECF No. 374 at 1; ECF No. 374-2 at 1.

[33] ECF No. 398 at 6–8.

1    argues that TCRY is seeking relief that is "diametrically opposed" to the

2    Permanent Injunction.[34]   Analyzed under either of those theories, the Court denies

3    TCRY's motion for the reasons that follow.

4    **A.    General Standard for Permanent Injunctive Relief**

5            To be entitled to a permanent injunction, the movant must demonstrate the

6    following: "(1) actual success on the merits; (2) that it has suffered an irreparable

7    injury; (3) that remedies available at law are inadequate; (4) that the balance of

8    hardships justify a remedy in equity; and (5) that the public interest would not be

9    disserved by a permanent injunction."[35]

10   **B.    Rule 60(b)(5)**

11          As relevant here, Rule 60(b)(5) states as follows:

12          Grounds for Relief from a Final Judgment, Order, or Proceeding.  On
             motion and just terms, the court may relieve a party or its legal
13          representative from a final judgment, order, or proceeding for the
             following reasons:
14                  . . .
            applying it prospectively is no longer equitable[.][36]

15

16

17   ───────────────

18   [34] ECF No. 398 at 6.

19   [35] *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d

20   1024, 1032 (9th Cir. 2013).

21   [36] Rule 60(b)(5). *But see* Rule 60(d) ("This rule does not limit a court's power to . . .

22   entertain an independent action to relieve a party from a judgment, order, or

23   proceeding[.]").

**C.    Burden on Party Seeking Amendment**

"[A] party seeking modification of [an injunction] bears the burden of establishing that a significant change in circumstances warrants revision of the [injunction].  If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance."[37]  "If the moving party cites significantly changed circumstances, it must also show that the changed conditions make compliance with the consent decree more onerous, unworkable, or detrimental to the public interest."[38]

---

[37] *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992) (addressing a requested modification to a consent decree in the context of institutional reform); *see also Bellevue Manor Assocs. v. United States*, 165 F.3d 1249, 1255 (9th Cir. 1999) ("*Rufo* sets forth a general, flexible standard for all petitions brought under the equity provision of Rule 60(b)(5).").  Despite the *Rufo* decision's general applicability, the "heavy burden" standard set forth therein likely applies with less force outside the context of a consent decree.  Still, the Court finds that a party's actual anticipation of a change in circumstances—as well as what actions the party did or did not take to address that potential change—are important considerations that may increase the showing required to amend an injunction.

[38] *Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1097–98 (9th Cir. 2021) (internal citations omitted).

**D.    Additional Considerations**

A court should not ordinarily modify a permanent injunction "where a party relies upon events that actually were anticipated."[39]  "Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it is no longer equitable that the judgment should have prospective application,' not when it is no longer convenient to live with [its terms]."[40]  Where a party anticipated a change in conditions that would make performance more onerous, "that party would have to satisfy a heavy burden to convince a court that it . . . made a reasonable effort to comply with the [injunction] and should be relieved of the undertaking under Rule 60(b)."[41]

"A district court's authority to modify an injunction is more limited than its authority to formulate an injunction in the first instance because of the additional interest in the finality of judgments."[42]  Although a court "cannot be required to disregard significant changes in law or facts if it is satisfied that what it was been

---

[39] *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (quoting *Rufo*, 502 U.S. at 385).

[40] *Rufo*, 502 U.S. at 383; *see also PUD No. 1 of Lewis Cnty. v. Wash. Pub. Power Supply Sys.*, 705 P.2d 1195, 1204 (Wash. 1985), *as modified by* 713 P.2d 1109 (Wash. 1986) ("The mere fact that a contract becomes more difficult or expensive than originally anticipated does not justify setting it aside.").

[41] *See Rufo*, 502 U.S. at 385.

[42] *Rousseau*, 985 F.3d at 1097.

1    doing has been turned through changing circumstances into an instrument of

2    wrong," injunctive relief must have elements of firmness and stability; "neither the

3    plaintiff nor the court should be subjected to the unnecessary burden of re-

4    establishing what has once been decided."[43]  "A balance must thus be struck

5    between the policies of res judicata and the right of the court to apply modified

6    measures to changed circumstances."[44]

### III.    ANALYSIS

8         TCRY alleges that three substantial changes in circumstances warrant

9    amending the Permanent Injunction.

### A.    Change in Rail Traffic

11        First, TCRY cites an increase in carloads on the Richland Trackage and a

12   decrease in TCRY's portion of such rail traffic, saying the following:

> At the time the Permanent Injunction was entered there was
> roughly 2,000 annual carloads that traversed the Richland
> Trackage.  Eighty-nine percent of those carloads were handled by
> the TCRY on behalf of the UP.  The annual carload count for 2021
> was 11,027 carloads, of those cars, the TCRY handled less than one
> percent with the UP and the BN handling ninety-nine percent.[45]

17   //

18   /

_____

21   [43] *AFL-CIO v. Wright*, 364 U.S. 642, 647–48 (1961) (cleaned up).

22   [44] *Id.*

23   [45] ECF No. 374-3 at 8.

1       1.    <u>TCRY was aware of—and voluntarily assumed the risk regarding—</u>

2                 <u>potential changes in rail traffic and maintenance costs.</u>

3          Both when first executing the 2002 Railroad Lease,[46] and when the Court

4 entered the Permanent Injunction in 2011,[47] TCRY was aware that rail traffic—

5 and the corresponding maintenance costs—were subject to change over time.  For

6 instance, in a July 2009 letter to the Port, TCRY acknowledged that the Railroad

7 Lease "transferred to TCRY all of the risks, liabilities, and costs associated with

8 operating the railroad, insulating the Port from the potential negative

9 consequences of Railroad operation while allowing enhancement of employment

10 and economic opportunities through the efforts of TCRY."[48]  Likewise, in an August

11 2009 declaration filed with the Court, TCRY said it had "assumed the significant

12 risks associated with restarting the DOE railroad after it had been closed."[49]

13          In October 2009, the Court noted on the record that it was foreseeable that

14 allowing BNSF and UP to operate directly on the Richland Trackage could cause

15 financial problems for TCRY, but that TCRY had assessed the risks and made an

16 informed business decision.  The Court said the following:

17

18 _____

19 [46] ECF No. 374-4.

20 [47] ECF Nos. 329, 342.

21 [48] ECF No. 43-1 at 6.  *See also* ECF No. 23 at 4 (July 2009 Port letter to TCRY re:

22 need for the operating agreement to address maintenance costs).

23 [49] ECF No. 43 (Aug. 2009 Decl. of TCRY Randolph Peterson) at 5.

It may end up with some economic duress as a result. That is, that the loss of revenue that BNSF no longer pays to TCRY has, in fact, based on the testimony caused some problems, and it's not uncommon for TCRY to go looking for other sources of revenue so it can try to stay in business or stay in business and have the same amount of revenue if they can generate other business.

So I look at it really as a market -- a marketplace situation where two business entities didn't have a provision and agreement which set out or protected the provider of services, TCRY. That's a contract drawn and which the parties live with, but it gave BNSF the right to reaccess the trackage, which I think is clear to me historically in the contracts, and, yet, that ultimately caused TCRY some . . . difficulty and an understandable reaction of a businessman in those circumstances that they resented it.[50]

Then, in December 2010, while arguing why the Railroad Lease should not be read as allowing BNSF and UP to operate directly on the Richland Trackage without payment, TCRY's witness stated the following:

The Lease obligated TCRY to maintain the Railroad without compensation. Operations on the Railroad by BNSF and UP would substantially increase TCRY's maintenance burden for which it received no compensation.
      . . . .
If both BNSF and UP were allowed to conduct direct operations bypassing interchange with TCRY, as BNSF has now done, there would simply be no business for TCRY to conduct, eliminating its revenue source in order to pay maintenance costs, operating costs, material costs, administrative costs, including insurance, taxes, payroll and rent to the Port.[51]

---

[50] ECF No. 106 at 186–87. *See also* ECF No. 107 at 8 (11.03.2009 Court order noting that "TCRY's business dropped off after the Court's preliminary injunction and it has now laid off more than a dozen employees.").

[51] ECF No. 197-0 at 15.

During negotiations with the Port, TCRY had tried to remove from the Railroad Lease the provision providing that TCRY could not impose any fees on BNSF or UP without the Port's prior written consent.[52]  Then, "when the Port refused to remove it, Mr. Peterson, a shrewd, sophisticated executive of TCRY, with undisputed authority, executed the Railroad Lease."[53]

TCRY was clearly aware of the potential for traffic to increase on the Richland Trackage, and it voluntarily assumed that risk when it agreed to maintain the Richland Trackage at its sole expense.  TCRY therefore has a heavier burden when seeking modification of the Permanent Injunction than it would if these increases were not anticipated.[54]

---

[52] *See* ECF Nos. 32-3 § 7.4, 264 at 21.

[53] ECF No. 264 at 21. Notably, the 2002 Ground Lease and 2002 Railroad Lease were not a simple continuation of the Port and TCRY's previous agreements under which the Port paid TCRY to maintain the Richland Trackage. *See* ECF No. 32-3 (32-4) at 18.  Rather, the parties significantly altered the framework by having TCRY cover the cost of maintenance in return for a significant reduction in the cost of rent of other property under the Ground Lease. *See* ECF No. 374-4.

[54] *See Asarco*, 430 F.3d at 979; *Rufo*, 502 U.S. at 385.  Even if TCRY's burden was not increased due to its anticipation of the changes it now relies upon, the Court would reach the same conclusions as to each of TCRY's alleged significant changes in circumstances.

2.    <u>TCRY fails to show why the alleged changes in rail traffic warrant revision of the Permanent Injunction.</u>

TCRY filed a declaration containing assertions regarding rail-traffic numbers, which TCRY says are based on "TCRY records."[55]  Although the other parties do not directly contest these numbers,[56] they relate only to 2012 and 2021, with no information regarding the intervening years.[57]  More, TCRY did not provide the "TCRY records" cited, the raw data underlying them, or any other evidence by which the Court could reasonably assess how the rail traffic—and each party's respective share of such traffic—has varied over the past decade.

Even assuming that the increased rail traffic and associated maintenance costs amount to a "significant change in circumstances," TCRY has failed to show that such increases warrant revision of the Permanent Injunction.[58]  TCRY's operations on the Richland Trackage have always been subject to the rights conferred to BNSF and UP by the 1947 and 1961 Agreements.  TCRY has provided no basis in law or fact for the Court to override those rights by amending the very Permanent Injunction designed to protect them.  Additionally, as discussed further

---

[55] *See* ECF No. 374-3 at 3 ¶¶ 11–13.

[56] Though no party directly contests TCRY's numbers, UP does take issue with the lack of supporting evidence. *See* ECF No. 397 at 4, 6.

[57] *See* ECF No. 374-3 at 3 ¶¶ 11–13.

[58] *Rufo*, 502 U.S. at 383.

below, TCRY fails to present evidence showing that its proposed remedy of charging BNSF and UP a $95/car tariff is "suitably tailored to the changed circumstance."[59]

**B.    Expiration of Ground Lease**

TCRY next contends that the expiration of its Ground Lease with the Port amounts to a significant change.  TCRY asserts that the Ground Lease's stated purpose was to support TCRY's operation of the Richland Trackage.  And, according to TCRY, without the revenue generated from the Ground Lease, "TCRY has been left with insufficient means to meet the maintenance needs of the Richland Trackage under the current environment."[60]

1.    <u>TCRY was aware of the Ground Lease's expiration date.</u>

Having negotiated with the Port regarding the terms of the Ground Lease, TCRY was fully aware that the Ground Lease was set to expire at the end of 2017.[61]  TCRY agreed to assume the risk of maintaining the Richland Trackage pursuant to the terms of the Railroad Lease despite having no guarantees that the Ground Lease would be renewed.  TCRY therefore has an increased burden to show why an amendment to the Permanent Injunction is warranted.[62]

---

[59] *Rufo*, 502 U.S. at 383.

[60] ECF No. 374-3 at 9.

[61] *See* ECF No. 374-5 at 3.

[62] *See Asarco*, 430 F.3d at 979; *Rufo*, 502 U.S. at 385.

2.    <u>TCRY fails to present evidence regarding the effects of the Ground Lease expiration.</u>

TCRY does not provide any evidence regarding the specific impact of the Ground Lease expiration.  Without such information, the Court cannot assess whether TCRY is truly without sufficient means to maintain the Richland Trackage.  Regardless, even assuming that TCRY's financial state is as it claims, the Court finds no basis in law or fact to replace TCRY's lost income by effectively superseding and rewriting the 1947 and 1961 Agreements.  The expiration of the Ground Lease does not warrant amending the Permanent Injunction.  For the same reasons, the Court also finds TCRY has failed to show that its proposed $95/car tariff is "suitably tailored to the changed circumstance."[63]

## C.    Exclusion of BNSF & UP from Tariff

Finally, TCRY asserts that "[a]nother significant change that has occurred since the Permanent Injunction was entered was the [Port]'s approval of TCRY's Miscellaneous Charges Tariff Supplement 1, which included the Railroad Maintenance Charge of $95 per car."[64]  TCRY contends that the Port's approval of the proposed tariff "proved to be a significant factual change, for it would have allowed TCRY to be able to generate the necessary revenue to support the maintenance of the Richland Trackage, the only problem was that the [Port]

---

[63] *Rufo*, 502 U.S. at 383.

[64] ECF No. 374-2 at 9.

approved it with the caveat that the charge could not be applied to the BNSF or the UP."[65]

The Court first notes that the exclusion of BNSF and UP from TCRY's $95/car tariff is *not* a change that occurred after entry of the Permanent Injunction. From entry of the Permanent Injunction in 2011 to present, none of TCRY's tariffs or other fees have ever applied to BNSF or UP.[66]  The Port's exclusion of BNSF and UP from TCRY's $95/car tariff therefore did not change anything; the exclusion kept things the same.  In this regard, the Court finds TCRY has failed to show a significant change in circumstance.[67]  The result is the same even if the Port's limited approval of the tariff did amount to a significant change.

     1.     <u>TCRY was aware that the Port was likely to exclude BNSF and UP from any generalized tariffs.</u>

The Permanent Injunction was based on the fact that "TCRY took possession of the Richland Trackage subject to BNSF and UP's pre-existing rights[,]" as established in the 1947 and 1961 Agreements.[68]  Those rights included the right to

---

[65] ECF No. 374-3 at 9.

[66] *See* ECF Nos. 336-1, 343.

[67] *Rufo* 502 U.S. at 383.

[68] *See* ECF No. 342 at 19.

operate directly on the Richland Trackage and to do so free of any "[r]ental or other charge."[69]

TCRY was fully aware of that the 1947 and 1961 Agreements applied to the Richland Trackage. In 2000, TCRY expressly acknowledged in an interchange agreement with BNSF that such agreement "[did] not limit BNSF's usage of trackage as provided under separate agreements dated November 6, 1947, and January 24, 1961, as supplemented and modified."[70] That same interchange agreement provided that "TCRC shall maintain its Interchange Tracks at its sole expense. BNSF shall have the right to use the Interchange Tracks without charge."[71] TCRY also knew in 2011 that neither the Permanent Injunction nor the COP provide for any charges relating to BNSF or UP's use of the Richland Trackage.[72]

TCRY was familiar with Court's orders, its prior dealings with BNSF, the absence of any maintenance charges in the COP, and the Port's correspondence with TCRY both before and after the Court entered the Permanent Injunction.[73]

_____

[69] *See* ECF No. 113-3 at 19.

[70] *See* ECF No. 32-3 at 28 (2002 TCRY interchange agreement with BNSF).

[71] ECF No. 32-3 at 28.

[72] *See* ECF Nos. 336-1, 343.

[73] *See, e.g.*, ECF No. 23 at 3–4 (July 2009 Port letter, stating that "if BNSF uses the Port railroad, the operations agreement should detail how BNSF will reimburse

Given this, TCRY was necessarily aware that the Port was likely to exclude BNSF and UP from any tariff arising from use of the Richland Trackage, especially a tariff which appears like it may compensate TCRY for more than the maintenance costs attributable to BNSF and UP.[74]  The Court finds that TCRY must have anticipated the exclusion of BNSF and UP from its proposed $95/car tariff, and TCRY therefore has an increased burden to show why amendment of the Permanent Injunction is warranted.

       2.    <u>The record lacks evidence regarding TCRY's maintenance work and associated costs.</u>

UP states that "TCRY refuses to provide documentation of the maintenance it is attempting to charge UP for—*and* TCRY is not maintaining the track up to the

---

TCRY for the costs of operating and maintaining the Port railroad."); ECF No. 72-6 (Sept. 2009 Port Letter, declaring a tariff proposed by TCRY as unenforceable).

[74] *See, e.g.*, ECF No. 47 at 86, 182 (BNSF witness in 2009 testifying that any costs would be paid to the Port); ECF No. 48 at 150–51 (BNSF counsel explaining that any maintenance charge would need to include "a right to audit the books to make sure that what we're being charged for is what was really spent on out there on the tracks."); ECF No. 48 at 150–51, 164 (BNSF counsel stating that "[i]t's not prepared to pay an additional fee to TCRY," and that BNSF "doesn't think that TCRY is entitled to any kind of profit on BNSF's exercise of rights.").

necessary standards."[75]  Similarly, BNSF points out that "TCRY has put no evidence in the record that it has actually engaged in any maintenance work on the Richland Trackage or the cost of any alleged such work."[76]  As such, even if the Court found an amendment of Permanent Injunction was warranted—which it does not—the Court could not possibly find TCRY's requested $95/car tariff to be "suitably tailored to the changed circumstance."[77]

       3.      <u>The Port's limited approval does not establish the $95/car tariff is reasonable or a suitably tailored remedy.</u>

TCRY argues that the $95/car tariff is a reasonable charge to impose upon BNSF and UP because TCRY's maintenance expenditures "were recognized by the [Port]'s approval of TCRY's Railroad Maintenance Charge in January of 2020."[78] Yet, far from recognizing the tariff as evidence of TCRY's maintenance expenditures, the cited January 2020 letter lists several reasons *not* to impose the tariff on BNSF and UP.  The Port cautioned that (1) the tariff could not be imposed on BNSF or UP, (2) TCRY did not provide actual maintenance costs, (3) there were multiple discrepancies in the report submitted in support of the tariff, and (4) the

---

[75] ECF No. 397 at 6.

[76] ECF No. 398 at 12.  The record supports the UP and BNSF's assertions. *See, e.g.*, ECF No. 35 ¶ 2; ECF No. 95-1 (95-2) at 7; ECF No. 374-7.

[77] *See Rufo*, 502 U.S. at 383.

[78] ECF No. 401 at 6.

1    Port's own calculations showed the tariff amount was significantly higher than

2    would be expected for a maintenance charge.[79]

3         The Court finds no basis in law or fact to amend the Permanent Injunction

4    based on the Port's decision to exclude BNSF and UP from TCRY's $95/car tariff.

5    TCRY has failed to show (1) BNSF and UP's exclusion from the tariff constitutes a

6    "significant change in circumstance," (2) that any such change "warrants revision"

7    of the Permanent Injunction, or (3) that the requested tariff is "suitably tailored to

8    the changed circumstance."[80]

9    **D.    Lack of Basis for Retroactive Relief**

10        TCRY has cited no cases or other authority to support its request for

11   "reimbursement" by way of retroactive application of the requested $95/car tariff.

12   The Court is unaware of any case in which relief granted under Rule 60(b) included

13   an award to the requesting party for past damages.  The Supreme Court has stated

14   that "on such terms as are just, a party may be relieved from a final judgment or

15   decree where it is no longer equitable that the judgment have *prospective*

16   *application*[.]"[81]

17

18

19   ───────────────

20   [79] *See* ECF No. 374-7 at 2–4.  The referenced TCRY report does not appear in the

21   record.

22   [80] *Rufo* 502 U.S. at 383.

23   [81] *Asarco*, 430 F.3d at 979 (citing *Rufo*) (emphasis added).

TCRY also fails to provide any evidentiary support for applying the requested $95/car tariff retroactively for more than a decade.  Accordingly, and for the same reasons discussed above regarding why TCRY's claims for prospective relief fail, the Court finds that none of TCRY's alleged changes in circumstance warrant revision of the Permanent Injunction to require retroactive imposition of the $95/car tariff upon TCRY and UP.  The Court further finds that the proposed retroactive tariff would not be a "suitably tailored" remedy.[82]

**E.    Statements by Counsel and Witnesses**

TCRY repeatedly asserts that the Court should amend the Permanent Injunction to "incorporate the commitments made by the BNSF and the UP to pay for their fair share of the maintenance."[83]  TCRY cites to statements made by counsel during the August 2009 preliminary-injunction hearing.

TCRY is correct that BNSF—through its counsel and witnesses—repeatedly expressed a willingness "to pay for its fair share of the maintenance costs

---

[82] *Rufo*, 502 U.S. at 383.

[83] ECF No. 401 at 2. *See also id.* at 4–6, 15; 374-2 at 2, 4–6.  The Court presumes that in asserting this argument TCRY's intends to invoke principles of equity, as TCRY cites no legal basis other than Rule 60(b)(5) to support its request that "the Court hold the BNSF and the UP accountable to their commitments that they made to the Court." *See* ECF No. 401 at 15.

associated with the line."[84]  But the record also makes apparent that BNSF believed, that such maintenance costs should be paid to *the Port* rather than TCRY.[85]  BNSF further explained that any maintenance charges would have to be strictly limited to its share of the actual maintenance costs, saying BNSF "doesn't think that TCRY is entitled to any kind of profit on BNSF's exercise of rights."[86] Even more, BNSF said that any maintenance-charge agreement would need to include "a right to audit the books to make sure that what we're being charged for is what was really spent on out there on the tracks."[87]  But TCRY, at least at the time, expressly rejected the notion that BNSF would pay only for maintenance costs, instead insisting that BNSF also pay TCRY for things such as "the disruption to its business."[88]

---

[84] *See* ECF No. 35 ¶ 10; ECF No. 47 at 86, 182; ECF No. 48 at 150–51, 164; ECF No. 272 ¶ 13.  Counsel for UP—which was at the time paying for maintenance costs via a cooperative marketing agreement—similarly agreed at the preliminary-injunction hearing that TCRY was "entitled to be compensated for the two division one's use" of the Richland trackage. ECF No. 48 at 149.

[85] *See* ECF No. 47 at 86, 182; ECF No. 272 ¶ 13.

[86] ECF No. 48 at 164.

[87] ECF No. 48 at 150–51, 164.

[88] *See, e.g.*, ECF No. 48 at 159.

1    Nothing in the record suggests that either BNSF or UP "committed" to

2  paying TCRY anything.  Instead, the overall picture is one of BNSF, and later UP,

3  expressing a willingness to meet and possibly come to terms regarding each

4  railroad contributing its "fair share" toward maintenance costs for the Richland

5  Trackage.  No such agreement was ever reached.  It would therefore be inequitable

6  to hold BNSF and UP to the undefined terms of a nonexistent agreement.  It would

7  be even worse to impose upon them TCRY's $95/car tariff, especially where the

8  record contains no evidence that TCRY made any reasonable offers or other

9  attempts to negotiate in good faith with BNSF and UP regarding maintenance

10  costs before trying to unilaterally impose the tariff and then bringing the instant

11  motion.  The Court finds that TCRY fails to show that "applying [the Permanent

12  Injunction] prospectively is no longer equitable."[89]

### IV.    CONCLUSION

14    The Court finds no basis in law or fact to amend the Permanent Injunction.

15  The Court finds that TCRY fails to show that "applying [the Permanent Injunction]

16  prospectively is no longer equitable."[90]  TCRY did not show that "a significant

17  change in circumstances warrants revision"; nor did it show that "the proposed

18  modification is suitably tailored to the changed circumstance" or how "the changed

19  conditions make compliance with the [Permanent Injunction] more onerous,

---

22  [89] *See* Rule 60(b)(5).

23  [90] *See* Rule 60(b)(5).

ORDER – 27

1    unworkable, or detrimental to the public interest."[91]  The Court also finds that

2    TCRY fails to show success on the merits, that other available remedies are

3    inadequate, that the balance of hardships justify the remedy sought, or that the

4    remedy sought would not disserve the public interest.[92]

5          Accordingly, **IT IS HEREBY ORDERED**:

6          1.       TCRY's Motion to Amend Permanent Injunction, **ECF No. 374**, is

7                   **DENIED**.

8          2.       This file shall be **CLOSED**.

9          **IT IS SO ORDERED.**  The Clerk's Office is directed to enter this order,

10   provide copies to all counsel, and close this file.

11         **DATED** this 6th day of June 2022.

12

13                                    _____
                                      EDWARD F. SHEA
                                      Senior United States District Judge

14

15

16

17

18

19

20

21   _____

22   [91] *See Rufo*, 502 U.S. at 383, 385; *Rousseau*, 985 F.3d at 1097–98.

23   [92] *See Indep. Training*, 730 F.3d at 1032.